UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                       :

NEFISSA KRAIEM,

                                :        **19 CV 5160 (ALC)**

              Plaintiff,            :

         - against -         :        **FIRST AMENDED COMPLAINT**

                                 :        **JURY TRIAL DEMANDED**

JONESTRADING INSTITUTIONAL
SERVICES LLC., JONESTRADING       :
INTERNATIONAL LIMITED, SHLOMO
COHEN, GARY CUNNINGHAM, DAVID   :
MAZZULLO, ALAN HILL, and STEVEN
CHMIELEWSKI,                  :
                   Defendants.       :
------------------------------------------------------------X

       Plaintiff Nefissa Kraiem ("Plaintiff"), by her attorneys, Stulberg & Walsh, LLP,

respectfully alleges as follows:

## NATURE OF THIS ACTION

      1.     Plaintiff is a former Equity Institutional Sales Trader employed by Defendant

JonesTrading Institutional Services LLC ("JTIS") and its wholly-owned subsidiary, Defendant

JonesTrading International Limited ("JTIL") (collectively, "Jones" or "the firm"), which are both

owned by the holding company Jones & Associates, Inc. ("JA").[1] At Jones, Plaintiff reported to,

among others, Defendants Shlomo Cohen, Gary Cunningham, David Mazzullo, Alan Hill and

Steven Chmielewski.

---

[1] As set forth below, JTIL and JTIS are a "single employer" within the meaning of: Title VII of the Civil
Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the New York State
Human Rights Law, New York Executive Law §§ 296 *et seq.* ("NYSHRL"); and the New York City
Human Rights Law, New York City Administrative Code §§ 8-101 *et seq.* ("NYCHRL").

2.      Jones provides equity trading and brokerage services throughout the United States ("U.S."), Canada and Europe and is one of the largest independent sales trader-focused platforms in its industry, with a network of more than 100 registered representatives nationwide.  Jones purports to have "broad and deep" relationships with more than 1,500 institutions and hedge funds.

3.      Jones advertises that it has "one of the lowest turnover rates in the securities industry" and that it is "proud to say when new people arrive, 'Welcome to your last job.'" Jones, however, employs astonishingly few women as traders.  Upon information and belief, Jones employed no more than five female traders and analysts at all pertinent times, while employing more than 90 male traders and analysts at those times.  Additionally, at all pertinent times, Ms. Kraiem was the only female trader in Jones' London office, and Jones did not employ any females in its New York City office.  Plaintiff was expected to, and did, work out of and travel to Jones' New York City office when visiting, supporting and cultivating U.S.-based clients and accounts.

4.      As set forth more fully below, Plaintiff, at all pertinent times, worked side-by-side with Jones' U.S. traders and supervisors, co-managing and pursuing accounts of U.S.-based clients.  Many of those clients and traders were based in New York City, including Plaintiff's largest account, which she co-managed with Mr. Mazzullo.

5.      During her time at Jones, Plaintiff was subjected to a severe and pervasive hostile work environment, in which male employees, including senior managers, repeatedly sexually harassed her.  Plaintiff was bullied, demeaned, objectified, molested, propositioned, harassed and prostituted by Jones' management.  Plaintiff received worse treatment than her male colleagues

with respect to terms and conditions of her employment, and was regularly made the brunt of vile, sexist actions and jokes.

6.     When Plaintiff complained about these conditions, Jones' employees retaliated against her by permitting the unlawful sexual harassment to continue unchecked (by, among others, the very supervisors to whom she had complained), and by unlawfully terminating her employment.

7.     Jones' actions devastatingly impacted Plaintiff's immediate and prospective business prospects throughout the U.S., and particularly in New York City, where she felt the immediate and long-term adverse effects of Jones' vile, gendered and discriminatory actions and its retaliatory conduct.  Jones' actions, *inter alia*, severely damaged Plaintiff's emotional well-being, and undermined her ability to support and foster clients and accounts throughout the U.S., particularly in New York City.

8.     Plaintiff, thus, brings this Complaint against JTIS, JTIL, and Messrs. Cohen, Cunningham, Mazzullo, Hill and Chmielewski (collectively "Defendants"), as Defendants unlawfully discriminated against her because of her sex and gender and retaliated against her for making complaints about that discrimination in violation of Title VII, the NYSHRL and the NYCHRL.

## THE PARTIES

9.     Plaintiff is a female, and resides in the United Kingdom.  Plaintiff was employed by Jones from June 15, 2016 until she was unlawfully terminated on January 15, 2018.  Prior to joining Jones in 2008, Plaintiff earned certificates in English and Business Administration from McGill University in Montreal, Canada.  In 2011, Plaintiff earned her Bachelor's Degree in

3

Private Law and her Master's Degree in International Law from the University of Paris,

Pantheon Sorbonne.  From in or around June 2011 to in or around March 2012, she worked for

UBS as a Prime Broker.  In or around September 2014, Plaintiff joined Market Securities as an

Analyst in Jones' London, England office.  At Jones, many of Plaintiff's clients and accounts

were based in the U.S., and particularly in New York City, where her largest account, which she

co-managed with Mr. Mazzullo, was based.  Consequently, Plaintiff was required to, and did,

travel throughout the United States, including to New York City, to conduct business on behalf

of Jones.

10.     Jones supervisors, based throughout the U.S., including in New York City,

managed and exercised supervisory control over Plaintiff.  Upon information and belief, JTIS is

a U.S. company and a New York resident, and Jones maintains an office in the City and State of

New York, at 757 3rd Avenue, 23rd Floor, New York, New York 10017.  Upon information and

belief, JTIL is a wholly-owned subsidiary of JTIS and maintains an office at Building 1,

Chalfont Park, Gerrards Cross, SL9 0BG, United Kingdom.  JTIS and JTIL are both owned by a

holding company, JA.

11.     Jones is a "single employer" within the meaning of Title VII, the NYSHRL and

the NYCHRL, and Jones has continuously employed at least fifteen employees.  At all pertinent

times herein, Jones has been an employer engaged in an industry affecting commerce within the

meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).  At all

pertinent times, Jones also has been an employer within the meaning of Section 296 of the

NYSHRL, NY Exec L §§ 292(5) and 296, and Section 107 of the NYCHRL, Admin. Code §§ 8-

102 and 8-107.

4

12.     At all pertinent times, JTIL and JTIS have worked in tandem and under common

management.  Indicative of the high degree of interrelation between JTIL and JTIS, both entities

are listed on the same "JonesTrading" website under a drop-down menu entitled, "Our

Companies."  Jones advertises on its website that JTIL "was launched in order to expand the

JonesTrading model into the European Union" and that Jones opened an office in London to

"provide better cross-border service for both US and European clients of JonesTrading

International Limited and JonesTrading Institutional Services LLC."  Jones further advertises on

its website that it uses its trading model "to find liquidity in multiple asset classes around the

world."  Jones states further on its website that, in order to provide access to such global asset

classes, Jones offers and provides services "in the United States . . . through JonesTrading

Institutional Services LLC," and in "Europe . . .  through JonesTrading International Limited."

13.     Upon information and belief, Jones, at all pertinent times, has operated a satellite

office in the United Kingdom ("U.K.") because Jones' U.S. based traders cannot trade in foreign

markets.  Jones' U.K. office enables it to sell its products outside of the U.S.

14.     At all pertinent times, Jones traders in the U.K. have primarily serviced U.S.

based clients, many of whom are headquartered in New York City and are dependent on Jones'

U.S.-based employees.  At all pertinent times, traders in Jones' U.K. office, when servicing U.S.

clients and selling Jones' U.S. financial instruments, have operated under the supervision of

Jones' U.S. traders.

15.     At all pertinent times, Jones' traders, across Jones' offices, have used "hoot-n-

hollers" (a/k/a "squawk boxes") on their desks to interact globally with Jones' traders in its other

offices and to coordinate business activities across markets.  At all pertinent times, those hoot-n-

hollers have provided a permanent, open communication circuit between the firm's employees, and Jones has conducted daily firm-wide briefings across its offices on these devices.  Upon information and belief, Jones' U.K office could not operate if it were severed from Jones' U.S. operation.

16.     At all pertinent times, JTIS and JTIL used a centralized Human Resources consultant, Mary Moser, SHRM-CP.  Upon information and belief, at all pertinent times, Ms. Moser ran Jones' Human Resource department, used by both JTIS and JTIL.  Ms. Moser was provided a Jones' email address, and her email signature read, in pertinent part, "Human Resources Consultant for JonesTrading."  Upon information and belief, at all pertinent times, Defendants Cunningham, Hill and Chmielewski each communicated with Ms. Moser concerning the terms and conditions of Plaintiff's employment at Jones.

17.     Plaintiff's employment contract permitted Jones, at any time, to transfer her employment contract, at its sole discretion, to any holding company or subsidiary of JTIL or JTIS, or to any associated employer of JTIL.  Upon information and belief, Jones' employment contracts with other employees permit it, at its discretion, to transfer those employees' contracts, at any time, to other Jones entities.

18.     Mr. Cohen, at all pertinent times, was employed by Jones as its Managing Director, Head of Investment Banking Equities and Capital Markets, and had supervisory control over, and managed, Plaintiff.  Mr. Cohen primarily worked out of Jones' New York City office, from which he exercised his supervisory control over, and managed, Plaintiff.  Jones is strictly liable for his unlawful discriminatory and retaliatory conduct pursuant to the NYCHRL.

19.     Mr. Cunningham is the Managing Director and Head of Global Sales for Jones. At all pertinent times, he was employed by Jones and had supervisory control over, and managed, Plaintiff.  Jones is strictly liable for his unlawful discriminatory and retaliatory conduct pursuant to the NYCHRL.

20.     Mr. Mazzullo, at all pertinent times, served as the President and Head of Global Sales for Jones and as a Director on the Jones Board, and had supervisory control over, and managed, Plaintiff.  Jones is strictly liable for his unlawful discriminatory and retaliatory conduct pursuant to the NYCHRL.

21.     Mr. Hill, at all pertinent times, served as the Chief Executive Officer for Jones and had supervisory control over, and managed, Plaintiff. Jones is strictly liable for his unlawful discriminatory and retaliatory conduct pursuant to the NYCHRL.

22.     Mr. Chmielewski, at all pertinent times, was employed by Jones and had supervisory control over, and managed, Plaintiff.  Mr. Chmielewski currently serves as Jones' Chief Operating Officer, and formerly served as Jones' General Counsel.  Upon information and belief, Mr. Chmielewski has served on the Boards of JA, JTIS, and JTIL.  Jones is strictly liable for his unlawful discriminatory and retaliatory conduct pursuant to the NYCHRL.

23.     Each of the individually-named defendants exercised supervisory control over, and managed, JTIL and JTIS employees.

## JURISDICTION AND VENUE

24.     Plaintiff has complied fully with all administrative prerequisites applicable to her claims.

25.     On May 8, 2018, Plaintiff timely filed a Charge of Discrimination ("Charge of Discrimination") against Jones with the United States Equal Employment Opportunity Commission ("EEOC") and the NYSDHR, complaining of the acts of sexual discrimination and retaliation alleged herein.

26.     On February 15, 2019, the NYSDHR granted Plaintiff a Dismissal for Administrative Convenience.

27.     On February 28, 2019, the EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on March 4, 2019.

28.     This Court has jurisdiction over Plaintiff's claims under Title VII pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 1331, 1343(a)(4).

29.     This Court has jurisdiction over Plaintiff's pendent state and local law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to Plaintiff's Title VII claims as to form the same case or controversy under Article III of the United States Constitution.

30.     This Court has jurisdiction over Plaintiff's pendent state and local law claims pursuant to NYSHRL § 297(9) and NYCHRL § 8-107 *et seq*.

31.     Venue is proper within this District, pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391(b) and (c), in that Jones resides and can be found in this District, and because a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this District.

## STATEMENT OF FACTS

### *Plaintiff's Hiring and Accomplishments at Jones*

32.     Plaintiff joined Jones on or about June 15, 2016 as an Equity Institutional Sales Trader focused on merger arbitrage, advising clients about and executing equity trades.  She worked in that capacity until Jones unlawfully terminated her employment on January 15, 2018.

33.     At Jones, Plaintiff opened one of the firm's biggest accounts in Europe, D.E. Shaw and Co., which, upon information and belief, previously had black-listed Jones in Asia. She also built up the firm's risk arbitrage desk for "European Special Situations" (*i.e.*, risk arbitrage involving mergers in which one party to the merger is European), brought major new clients to the firm, supported U.S.-based accounts (including accounts based in New York City), improved the firm's trading with its U.S. clients, and was a major contributor to the firm's efforts to secure a new governmental fund account, the Abu Dhabi Investment Authority.  Plaintiff, at all pertinent times, was supervised at Jones by, *inter alia*, Jones employees based in New York City, including but not limited to, Mr. Cohen.

34.     At Jones, Plaintiff's accounts were almost entirely based in the U.S., and many of them were located in New York City, including her largest account, which she co-managed with Mr. Mazzullo.  Plaintiff supported her U.S.-based clients by working in tandem with Jones' employees in the U.S., who supervised and co-managed her accounts.  Accordingly, Plaintiff's job required her to interact daily with Jones traders and analysts across its offices, often using the hoot-n-holler to discuss market conditions, broadcast accomplishments, and trade. Consequently, Plaintiff regularly travelled throughout Europe and the U.S., including to New York City.

35.     Upon information and belief, Plaintiff's New York City-based clients expected her to travel to New York City and meet with them.  Upon information and belief, Jones also expected Plaintiff to travel to New York City for work, and Jones' supervisors invited her to New York City to meet with clients and prospective clients.  When travelling to New York City for business, Plaintiff was expected to, and did, work out of Jones' New York City office.

### *Jones' Sexually Hostile Work Environment and Sexual Harassment of Plaintiff*

36.     Upon starting at Jones, Plaintiff quickly learned that the firm, by its senior management, including Defendants Cohen, Cunningham, Mazzullo, Hill and Chmielewski, encouraged and maintained a culture pervaded by sexual harassment and intimidation across its offices.  Charlie McBride, Jones' Managing Director, emailed Plaintiff and told her not to "let our poor American manors [sic] bother you."  Plaintiff, in response, thanked him and wrote that it was "amazing" that she was the only woman the office.  In fact, the near total absence of female traders and analysts at the firm reflected the sexist and hyper-masculine culture Jones worked to cultivate.  Jones employed no more than five female traders and analysts at all pertinent times, while employing more than 90 male traders and analysts.

37.     Upon information and belief, Jones operated like a rowdy frat house, with employees using sex workers at work-related events and entertaining clients and potential clients with illicit drugs.  Locker room talk was the norm, and Jones' traders regularly made vile, sexist and misogynistic jokes and remarks – which were frequently directed and targeted at Plaintiff.  Much of that animus derived from Jones' New York City-based traders and occurred in New York City.

10

38.     Jones' degradation and mistreatment of Plaintiff began during her onboarding, and constituted a pattern and practice of unlawful conduct throughout Plaintiff's employment. While reviewing Plaintiff's candidacy, Mr. Cunningham referred to her as "the Lion King girl" in emails with Mr. Hill.  Upon learning that Plaintiff was joining Jones, Nick Finegold, a friend of Mr. Cunningham's who helped recruit Plaintiff to Jones, sent Mr. Cunningham a message saying that Mr. Cunningham should "[t]ry not to sleep with [Plaintiff] please."

39.     Upon information and belief, on Plaintiff's first day at Jones, when her hiring was announced over the hoot-n-holler, traders in the New York City office rushed to ogle Plaintiff's social media accounts and comment on her appearance, saying things like "she's fucking hot." Plaintiff, in turn, received numerous requests from Jones' New York City employees to connect with her on various social-media sites, presumably so that they could gawk at her photographs.

40.     Upon information and belief, throughout the entirety of Plaintiff's employment at the firm, Jones' traders and analysts across its offices, regularly commented on Plaintiff's appearance when she spoke over the hoot-n-holler.  Upon information and belief, in New York City, traders regularly questioned aloud, in words or effect, "who she was banging" and accused her of using her sexuality to advance her career.

41.     As Plaintiff's direct supervisor and as the Chief Executive Officer of the London Office, Mr. Cunningham regularly discriminated against, harmed, humiliated and demeaned Plaintiff.  Mr. Cunningham regularly assigned U.S. accounts to Plaintiff's male peers – even assigning one such account to a non-client-facing male employee – but never once gave Plaintiff such an assignment, unless a client specifically requested her help.

42.     Mr. Cunningham, throughout Plaintiff's time at Jones, referred to her as
"Princess," and he often called her volatile and childlike.  On a near daily basis, Mr.
Cunningham made derogatory comments about Plaintiff to co-workers and clientele,
undermining her credibility and inhibiting her ability to secure new clients and service existing
clients.  Mr. Cunningham, however, refrained from similarly disrespecting his male supervisees.
Plaintiff, on a near daily basis, told Mr. Cunningham, in words or effect, that she disapproved of
his antics and treatment of her.

43.     For example, in or June 2016, at lunch with a client at Le Petite Maison, Mr.
Cunningham was consistently disrespectful to Plaintiff, stating in front of the client that she was
"only there to entertain."  Upon returning to the office, Plaintiff told Mr. Cunningham that he
needed to start "valuing her brain."  He responded by laughing, and telling Plaintiff that the
client had referred to her as "a great asset" and "a great hire."  Mr. Cunningham, in front of the
entire office, told Plaintiff that he responded to the client by stating, "Yes, until she's not."

44.     In or around May 2017, upon information and belief, Mr. Cunningham, speaking
to a client about Plaintiff, implied that Plaintiff was more flirtatious than professional.  Upon
information and belief, Mr. Cunningham told the client, in a seemingly sarcastic tone, in words
or effect, that Plaintiff had a "particular talent in the way that she deals with her clients," and that
he was surprised the client got along with Plaintiff because he did not "think she was [your] type
of person."  Upon information and belief, the client believed Mr. Cunningham to be insinuating
that Plaintiff used her sexuality to drive business.

45.     Plaintiff's colleagues at Jones freely discriminated against her in furtherance of
the firm's sexually hostile culture.  For example, Plaintiff was invited to join a Jones WhatsApp

group-chat with several of her office mates, including Mr. Cunningham and Darren Yarlett, Jones' Compliance Officer. Although the group-chat ostensibly was used for work purposes, Ms. Kraiem was subjected on the group-chat to a barrage of bigoted, misogynistic and sexist messages from her coworkers. Many of those messages were sent by Mr. Cunningham and Mr. Yarlett, who had Human Resources responsibilities at Jones.

46.    In that same group-chat, Jones' employees, including Mr. Cunningham, shared photographs and videos of, among other things, scantily clad women, sex shops, articles concerning a sex dungeon, bigoted and racist memes, and misogynistic memes commenting on the physical appearance of females. Jones' employees regularly also sent sexist messages on the group-chat deriding wives and girlfriends, and shared entirely inappropriate barbs about their colleagues' sex lives.

47.    Plaintiff bore the brunt of many derogatory and sexist group-chat messages specifically directed at her. Employees, including Mr. Yarlett and Mr. Cunningham, commented about, among other things, her appearance and weight, and referred to her as "princess." Plaintiff's coworkers shared photographs that they took of Plaintiff, unbeknownst to her. Plaintiff, in disgust, removed herself from the group-chat on or about August 30, 2017, after a colleague shared a video of the boxer, Floyd Mayweather, showering strippers with money.

48.    The harassment endured by Plaintiff went well beyond receiving inappropriate group-chat messages. For example, in or around September 2016, at a work event in Rome, a fellow Jones trader drunkenly asked Plaintiff if he could go back to her hotel room. Plaintiff declined his advances, and informed Mr. Cunningham of the incident. Rather than address it,

Mr. Cunningham, upon information and belief, gossiped to Plaintiff's colleagues about the incident and made light of the situation.

49.     On or about April 27, 2017, while at a Jones event in Dallas, Texas lasting until on or about April 30, 2017, Mr. Mazzullo, then President of Sales, unexpectedly hugged Plaintiff, grabbed her waist, and said, in words or effect, to other male employees, "Look at her, guys. Who would not trade with her?  She is such a beauty."  Mr. Mazzullo also said, in reference to Plaintiff's looks, in words or effect, "I am sure it is not that hard for you to get clients to trade."

50.     Later that day, after Plaintiff declined go with Jones employees to a strip club, Mr. Mazzullo followed her to her hotel, grabbed her, asked where her room was, and implored her to go to the club, using his position of authority to try to pressure her.  Mr. Mazzullo told Plaintiff, in words or effect, that he is the "President" and "the biggest producer" and was going to be spending a lot of money at the club for Jones' employees.

51.     Plaintiff told Mr. Mazzullo that she was uncomfortable and proceeded to walk to her room, but Mr. Mazzullo refused to stop.  He followed her to her door and asked if he could return later to "say good-bye."  Although Plaintiff told him not to do so, Mr. Mazzullo persisted, repeatedly saying, over her constant objections, that he would come to Plaintiff's room later that night.  Mr. Mazzullo's actions left her shaken and intimidated.

52.     At that same Dallas event, male Jones employees repeatedly sexually humiliated Plaintiff, insinuating that Jones only employed her for "entertainment" purposes and/or for her looks.  One Jones trader messaged his colleagues on a group-chat that he was going to give Plaintiff's room number to "one of the 40 overweight guys" at the conference.  Later that day,

14

the same trader sent a message to the group-chat saying that he "told all the guys last night that [Plaintiff was] coming off a bad break up and [is] single." Tim O'Neil, Jones' President of Trading, messaged Plaintiff that Jones employees were at a bar discussing how "hot" she was and how they wanted Plaintiff to "go out with them."

53.     In Dallas, the Jones management team, including, Mr. Hill, Mr. Chmielewski and Jeff LeVeen, Jr., Managing Director, Head of Outsourced Trading and Office Branch Manager, apparently learned that Plaintiff had had a romantic relationship with Mr. O'Neil, and took this information as a license to further sexually demean Plaintiff.  Upon information and belief, Mr. Chmielewski and Mr. Hill told Mr. O'Neil that he was no longer allowed to speak to Plaintiff, and Mr. O'Neil was subsequently asked to sign paperwork to that effect.  Upon information and belief, Plaintiff was referred to during the management team's conversation as a "bad woman with an agenda."

54.     On April 29, 2017, Mr. O'Neil messaged Plaintiff that he "might be getting fired" because of their relationship and that he had been told to "choose [Plaintiff] or Jones."  Plaintiff and Mr. O'Neil, in turn, ended their relationship and stopped regularly messaging one another. However, Mr. O'Neil began incessantly messaging Ms. Kraiem in or around September 2017, repeatedly inquiring into inappropriate subject areas, like her current relationship status and reminiscing about the "fun" they had previously had together.

55.     Plaintiff reported Mr. Mazzullo's harassment to Mr. Cunningham in early May 2017.  Mr. Cunningham's response epitomized the firm's sexually hostile culture: he brushed Plaintiff's complaint off as business as usual, telling Plaintiff that that was "Classic Dave" and, in words or effect, that "of course" Mr. Mazzullo "was going to try" to come to her room.  Upon

information and belief, approximately two weeks thereafter, in Jones' Greenwich, Connecticut office, a Jones employee referred to Plaintiff's looks, prompting Mr. Mazzullo to say, in words or effect, that Plaintiff was "not his type."  In response, Mr. Cunningham chided Mr. Mazzullo, saying in words or effect, that he had "heard otherwise" and that Mr. Mazzullo had followed Plaintiff to her hotel room in Dallas.  Following Plaintiff's rejection of Mr. Mazzullo's unwanted advances, her complaint to Mr. Cunningham about Mr. Mazzullo, and the revelation of her relationship with Mr. O'Neil, Plaintiff became a pariah at Jones.

### *Plaintiff's Outsider Status*

56.    Jones' pervasive sexually hostile environment, and the animosity engendered by Plaintiff's complaints about Mr. Mazzullo's conduct in Texas, reverberated throughout Jones and followed Plaintiff to its New York City office, which she visited for work from on or about July 10 through 16, 2017.

57.    Upon information and belief, Jones' employees in New York City ceased voluntarily working with her and/or otherwise tried to avoid interacting with her.

58.    For example, upon information and belief, senior managers and senior traders said, in words or effect, "nothing good comes from interacting with [Plaintiff]" and "what's the point of interacting with her, it can just cause trouble."  Upon information and belief, Jones employees in the New York City office also asked aloud, in words or effect, if Plaintiff was "banging Tim O'Neil."  Such statements and sentiments inhibited Plaintiff's ability to co-manage accounts with her New York City-based co-workers, leverage her co-workers' contacts and connections to develop new accounts and clients in New York City and elsewhere, and exchange information with her co-workers concerning global market conditions and

16

developments.  The extent and effects of Defendants' animus and hostile actions directed towards Plaintiff further impacted her adversely during her business trip to New York City on or about July 10 through 16, 2017.

59.     On or about July 10, 2017, while in Jones' New York City office, Plaintiff overheard John D'Agostini, a Jones employee, say to other Jones employees, in words or effect, about Plaintiff: "who's fucking her then?"  Plaintiff later confirmed in a Bloomberg chat with former Jones employee Yousef Abbasi that Mr. D'Agostini had made that remark.  At or around the same time, at Jones' New York City offices, Plaintiff observed male employees openly ogling her pictures on her social media accounts and commenting on her breasts, saying, in words or effect, "look at her breasts" and "look at her boobs."

60.     On Friday, July 14, 2017, Mr. Cohen and Plaintiff agreed to have drinks with New York City-based clients and potential clients, at a New York City bar called "The Jimmy," where she hoped to develop new business relationships and accounts.  At The Jimmy, a Jones client instructed Plaintiff, in words or effect, to "come with me to the toilet and I'll go down on you."  When Plaintiff reported this lewd proposition to Mr. Cohen, Mr. Cohen apologized but made light of it, saying, in words or effect, "I'll request a big ticket from him [*i.e.*, the client] on Monday" – essentially boasting that Plaintiff's sexual humiliation at work had commercial value for Jones.  Plaintiff felt immediately and deeply hurt by these events.

61.     Upon information and belief, on the next workday, in Jones' New York City office, Mr. Cohen laughed and joked about the incident referenced in paragraph 60 herein, telling the firm's employees that a client had, in words or effect, asked Nefissa to "sit on his face."

Upon information and belief, Jones never took any action to rectify the situation, admonish the client, or discipline Mr. Cohen.

62.     During that same trip to New York City, Mr. Cunningham invited Plaintiff to have drinks with New York City-based clients at a bar on July 11, 2017, and she was led to believe by Mr. Cunningham that she might be placed on those clients' accounts.  Mr. Cunningham then messaged her that the dress code was "cool and sexy. So you better not come." When Plaintiff arrived at the bar, Mr. Cunningham introduced her to clients, in words or effect, as the head of "fashion" and "entertainment" and "occasionally [a] trader" – thereby humiliating and demeaning Plaintiff and her professional status and accomplishments.

63.     During the same client event, Mr. Cunningham asked Plaintiff, in the presence of clients, if her dress was lingerie or a real dress and said, in words or effect, "I don't even see how you can wear underwear under that."  Mr. Cunningham then insinuated in front of clients that Plaintiff seduced and entertained clients in order to get trading orders, further humiliating and demeaning her and essentially ensuring that she would not be taken seriously by those clients or given an opportunity to work with them.

64.     During the same client event, while at the bar, Mr. Cunningham insisted that Plaintiff let him take a photograph of her with a client, and then proceeded to message the photograph to their co-workers with an accompanying caption which read, in words or effect, "look who wants to change coverage now."  In so doing, Mr. Cunningham again insinuated that Plaintiff was using her sexuality to obtain new accounts and again severely undermined Plaintiff's reputation as a professional trader worthy of new business opportunities.

65.     After leaving the client event, Mr. Cunningham walked Plaintiff back to the W hotel, where she was staying. They proceeded to the hotel's bar, where Plaintiff broke down crying. Plaintiff confronted Mr. Cunningham, saying, in words or effect, that he could not "keep treating [her] like this." Plaintiff told Mr. Cunningham that he habitually made her look bad in front of clients, picked on her, and used her as a punching bag. She further complained that she did not understand why he treated her so poorly, and that she was incredibly frustrated.

66.     In response, Mr. Cunningham apologized to Plaintiff, telling her, in words or effect, that he would cease treating her poorly. He then hugged her. The next day, July 12, 2017, Mr. Cunningham sent Plaintiff a message saying, "I listened to everything you said last night. You are truly amazing and I will tell you that every other day."

67.     The events set forth in paragraphs 36 through 66 herein devastatingly impacted Plaintiff's emotional well-being and her immediate and prospective business prospects throughout the U.S., and particularly in New York City, where she felt the immediate and long-term adverse effects of Jones' vile, gendered and discriminatory conduct. With respect to her business prospects, Jones' actions significantly inhibited Plaintiff's ability to support and develop U.S. clients and accounts, particularly in New York City.

### *Jones' Retaliatory Campaign against Plaintiff*

68.     Having been sexually humiliated, harassed and prostituted throughout her time in New York City, Plaintiff returned to London on or about July 16, 2017, hoping that the worst was behind her. However, things took a dramatic change for the worse, and Defendants began retaliating against Plaintiff for the complaints she had made in New York City.

19

69.     Within days of returning to London, Mr. Cunningham messaged Plaintiff and her colleagues, in a group-chat, that Plaintiff looked as if she was "homeless and coming straight in off the park bench."  Plaintiff told Mr. Cunningham, in the group-chat, to "watch his mouth."

70.     Mere days thereafter, Mr. Cunningham, while on a business trip to Abu Dhabi, made numerous derogatory comments about Plaintiff.  He claimed, in front of colleagues and clients, that she was only on the trip for entertainment purposes, prompting Plaintiff's colleagues to intervene and tell him he was behaving inappropriately.  During that trip, Mr. Cunningham, in a message sent to Plaintiff and her colleagues, told Plaintiff to wear a bikini.

71.     Thereafter, Mr. Cunningham became increasingly outwardly hostile towards Plaintiff.  On or about July 26, 2017, he wrote to Plaintiff that she had to stop "barking and sulking" when things did not go her way, and that he "cannot deal with [her] constant mood swings."  Mr. Cunningham even suggested that Plaintiff "mov[e] away from thinking of [herself] as risk arb and develop a different book.  Really work hard on say 5 and do more pairing up with US sales traders who would appreciate you getting out with their clients."  Plaintiff strenuously objected to his insinuation that she only added value to Jones by entertaining its clientele and, shortly thereafter, informed Mr. Cunningham that she was being treated like a "witch who came to ruin everyone."

72.     The retaliation against Plaintiff escalated on August 8, 2017, after an argument ensued on the floor of Jones' London office because a trader did not know how to execute a particular trade, upsetting a client and costing Plaintiff (the sales trader on the transaction) a commission.  The trader called Plaintiff "dangerous" and "a stupid woman," prompting Plaintiff

to complain to Mr. Cunningham about the manner in which she was being treated and to request that Mr. Cunningham apologize to the client on Jones' behalf.

73.     In response, Mr. Cunningham messaged Plaintiff that "in my 32 years in this business I have never seen someone with as little experience in our industry talk to people like you do. It is truly astounding ... WHO DO YOU THINK YOU ARE." He further wrote to her that she has "no manners ... zero." Plaintiff retorted that Mr. Cunningham was, once again, treating her disparately from the rest of her team, as Mr. Cunningham had previously apologized to a client after a similar incident occurred involving a male sales trader. Mr. Cunningham ignored her sexual discrimination complaint, replying with "[m]y problem with you is you have no idea how to talk to people."

74.     Approximately two weeks thereafter, Plaintiff told Mr. Cunningham that she was interested in filing a Human Resources complaint regarding the August 8, 2017 argument. On August 29, 2017, Mr. Cunningham forwarded to Plaintiff (apparently inadvertently) an email he had sent to Defendants Chmielewski and Hill, entitled "Draft email to Nefissa Kraiem" and stating, in part, "you clearly have a unique style with the accounts that you speak to and maybe there is a better firm out there that can harness your talents but if you decide to stay, please know you will have our full support for as long as your behaviour warrants it." That same day, Mr. Cunningham emailed Plaintiff that he wished to schedule a meeting with Mr. Yarlett, Mr. Chmielewski, and Mary Moser (Jones' human resources consultant) to "discuss the firm's anti-harassment policies and our expectations for your conduct going forward in light of some recent events."

21

75.     Mr. Cunningham's August 29, 2017 emails represented the culmination of more than a year's-worth of harassment that Plaintiff had endured.  That day, Plaintiff experienced the first of several work-induced panic attacks that she would suffer over the following months. Plaintiff spent the night in the hospital, and began receiving medical attention for the trauma caused to her by Jones' unlawful discriminatory and retaliatory actions.

***The End of Plaintiff's Employment at Jones***

76.     Beginning on August 31, 2017, the day after Plaintiff's discharge from the hospital, and continuing for approximately the next four months, Plaintiff spoke with Ms. Moser about the intentional disparate treatment and the sexually hostile work environment to which she was being subjected.

77.     Plaintiff told Ms. Moser that she felt like a black sheep and told her about the emails referenced in paragraph 74.

78.     Upon information and belief, Messrs. Cunningham, Hill, and Chmielewski had, as of the middle of August 2017, begun planning to constructively discharge Plaintiff by relocating Jones' London office to Gerrards Cross, a town approximately two hours away from the home in London that Plaintiff resided in, and was actively negotiating to purchase.  Upon information and belief, Jones knew that Plaintiff could not undertake such a commute and arrive to work for a daily 8:00 a.m. market-open time, given the distance from her home to Gerrards Cross.  Further, upon information and belief, Jones knew that its other seven employees in the London office would not leave the firm if were it to relocate to Gerrards Cross because: two of those employees lived in Gerrards Cross; four lived outside of London and would have a similar commute to

Gerrards Cross as they had to London; and the remaining employee was required, for immigration reasons, to continue working for Jones or face deportation.

79.     Upon information and belief, Jones discussed, and solicited feedback about, its Gerrards Cross plans with some of Plaintiff's co-workers in or around the middle of August 2017, but Jones did tell Plaintiff that it might relocate its office until in or around early September.  Shortly after Plaintiff learned about the potential move, Mr. Cunningham, on or about September 8, 2017, told Plaintiff, in words or effect, that the company was exploring its options because it was "sick of her drama."

80.     Upon information and belief, Jones had no intention of keeping its London office open.  To that end, Mr. Cunningham, on October 4, 2017, sent an email to the London staff announcing that the London office would close unless they reached an entirely unrealistic six-month revenue goal.  It was clear to Plaintiff at the time that the revenue goal was a mere pretext, and that the announcement was designed to end her employment at Jones.

81.     Plaintiff regularly complained about the move and, on or about October 17, 2017, specifically shared her concerns with Mr. Cunningham.  Thereafter, on November 14, 2017, Mr. Hill and Mr. Cunningham exchanged emails with the subject line "Evasive Action."  In one such email, Mr. Cunningham wrote that "Given the fuss [Plaintiff] has already made about leaving Mayfair I do not think she would work out of [the relocated office]," and suggested meting out her accounts to others.  The email further stated that "[w]e can always come back to Central London if we find the right team," implying that Plaintiff was part of the "wrong team," even though she was among Jones' top performers.

82.     Faced with Jones' continuing retaliation, her declining health and her precarious employment situation, Plaintiff canceled a previously planned trip to New York City in or around December 2017 to visit clients.

83.     The firm ultimately dropped its pretextual revenue goal, and Mr. Hill, on December 15, 2017, announced that Jones would close the London office at the end of January 2018 – well before the end of the previously announced six-month timeframe.  That announcement effectively sealed Plaintiff's fate at Jones.

84.     On December 22, 2017, Jones sent Plaintiff a proposed revised contract, stating that the firm intended to move to Gerrards Cross by January 31, 2018, and conditioning her continued employment on her agreement to move to that location.  Plaintiff refused to sign the contract, and by a January 15, 2018 letter, was informed that her employment had been terminated.

85.     Upon information and belief, Plaintiff's termination constituted an involuntary constructive discharge, precipitated by the intolerable, intentional unlawful discrimination and retaliatory conduct to which Plaintiff was subjected at Jones, and the pretextual change of work location designed to force Plaintiff's departure from the firm.

86.     In sum, Jones unlawfully discriminated against Plaintiff because of her sex and gender, and unlawfully retaliated against her for making complaints about that discrimination, all in violation of Title VII, the NYSHRL and the NYCHRL.

***Jones' Witness Tampering***

87.     Following Plaintiff's discharge, Jones, through its management, took steps to undermine Plaintiff's ability to seek recourse.  Upon information and belief, in or around late

24

February 2018 or early March 2018, Jeffrey Sloves, Managing Director and head of Jones' New York City office, brought Mr. Abbasi into a conference room in Jones' New York City office for a telephone call with Mr. Hill about Plaintiff.  Upon information and belief, during that telephone call, Mr. Hill told Mr. Abbasi, in words or effect, that Jones knew he was close with Plaintiff because Jones had been reviewing Plaintiff's Bloomberg Messenger chats with him.  Upon information and belief, Mr. Hill specifically referenced a Bloomberg Messenger chat that Mr. Abbasi had had with Plaintiff, in which he confirmed to Plaintiff that Mr. D'Agostini was the employee who, on or about July 10, 2017, had asked aloud "who's fucking her then."  Upon information and belief, Mr. Hill told Mr. Abbasi to "shut the fuck up," threatened to discharge him, and stated, in words or effect, that Mr. Abbasi's "year end bonus was entirely tied to his ability to shut the fuck up."

88.     Upon information and belief, on or about June 26, 2018, Mr. Abbasi was summoned to a conference room in Jones' New York City office for a telephone call with Mr. Hill, who told him that he was being placed on administrative leave for alleged expense account improprieties.  Upon information and belief, three days later, the firm told Mr. Abbasi that he had 24 hours to justify 30 months' worth of expenditures relating to, among other things, client travel, media appearances, and charity events.  Upon information and belief, the allegations of expense account improprieties were wholly unwarranted, and the threats made against Mr. Abbasi were designed to discourage him from serving as a witness for Plaintiff in proceedings against Jones.

89.     The unlawful sexual harassment, hostile work environment, and retaliation to which Plaintiff was subjected at Jones have caused her to suffer severe emotional damage, which

has adversely affected her health and well-being, and has caused her reputational damage and humiliation.

## AS AND FOR A FIRST CAUSE OF ACTION (As Against Jones)

### Discrimination Based on Sex in Violation of Title VII

90.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 89 herein as though recited at length herein.

91.     Jones is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

92.     At all times pertinent herein, Plaintiff was an "employee" of Jones within the meaning of 42 U.S.C. § 2000e(f).

93.     Plaintiff, a female, is a member of a class protected by Title VII.

94.     Jones intentionally discriminated against Plaintiff by taking the adverse actions referenced in paragraphs 1 through 89 herein, solely on the basis of Plaintiff's sex.

95.     Jones has discharged Plaintiff and has discriminated against Plaintiff with respect to terms, conditions and privileges of employment, as referenced in paragraphs 1 through 89 herein, on the basis of Plaintiff's sex, in violation of 42 U.S.C. § 2000e-2.

96.     Upon information and belief, Jones' discriminatory treatment of Plaintiff was part of a pattern and practice of intentional sex discrimination at Jones.

97.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 89 herein detrimentally affected Plaintiff.

98.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 89 herein would detrimentally affect a reasonable female in the same position as Plaintiff.

99.     The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 89 herein occurred in, and/or had an impact felt in, the City and State of New York.

100.    Jones committed the unlawful acts referenced in this First Cause of Action with malice and/or with reckless indifference to the federally protected rights of Plaintiff.

101.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and other damages, including, but not limited to, pain and suffering, humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and damage to reputation, as a result of Jones' discriminatory acts unless and until this Court grants the relief requested herein.

102.    Jones failed to exercise reasonable care to prevent and correct promptly the unlawful discrimination referenced in paragraphs 1 through 89 herein.  Jones did not offer, and Plaintiff did not fail to take advantage of, any legitimate opportunities to prevent or correct the unlawful discrimination referenced in paragraphs 1 to 89 herein.  Jones is therefore strictly liable for the unlawful discrimination complained of herein.

103.    No previous application has been made for the relief requested herein.

**AS AND FOR A SECOND CAUSE OF ACTION (As Against All Defendants)**

**Discrimination Based on Sex in Violation of NYSHRL**

104.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 89 herein as though recited at length herein.

105.    Jones is an "employer" within the meaning of New York Executive Law § 296 *et seq.*

27

106.    At all times pertinent herein, Plaintiff was an "employee" of Jones within the meaning of New York Executive Law § 296 *et seq.*

107.    Plaintiff, a female, is a member of a class protected by NYSHRL.

108.    Defendants intentionally discriminated against Plaintiff by taking the adverse actions referenced in paragraphs 1 through 89 herein, solely on the basis of Plaintiff's sex.

109.    Defendants have discharged Plaintiff and have discriminated against Plaintiff with respect to terms, conditions and privileges of employment, as referenced in paragraphs 1 through 89 herein on the basis of Plaintiff's sex, in violation of New York Executive Law § 296 *et seq.*

110.    Upon information and belief, Defendants' discriminatory treatment of Plaintiff was part of a pattern and practice of intentional sex discrimination at Jones.

111.    The intentional discrimination against Plaintiff referenced in paragraphs 1 through 89 herein detrimentally affected Plaintiff.

112.    The intentional discrimination against Plaintiff referenced in paragraphs 1 through 89 herein would detrimentally affect a reasonable female in the same position as Plaintiff.

113.    The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 89 herein occurred in, and/or had an impact felt in, the City and State of New York.

114.    Defendants Messrs. Cohen, Cunningham, Mazzullo, Hill, and Chmielewski were each supervisory employees of Jones and aided and abetted the discriminatory actions referenced in paragraphs 1 through 89 herein and, therefore, are individually liable for the unlawful discrimination complained of herein.

115.    Defendants committed the unlawful acts referenced in this Second Cause of

Action with malice and/or with reckless indifference to the protected rights of Plaintiff.

116.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable

injury, monetary damages and other damages, including, but not limited to, pain and suffering,

humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and

damage to reputation, as a result of Jones' discriminatory acts unless and until this Court grants

the relief requested herein.

117.    Defendants failed to exercise reasonable care to prevent and correct promptly the

unlawful discrimination referenced in paragraphs 1 through 89 herein.  Defendants did not offer,

and Plaintiff did not fail to take advantage of, any legitimate opportunities to prevent or correct

the unlawful discrimination referenced in paragraphs 1 to 89 herein.  Defendants are therefore

liable for the unlawful discrimination complained of herein.

118.    No previous application has been made for the relief requested herein.

## AS AND FOR A THIRD CAUSE OF ACTION (As Against All Defendants)

### Discrimination Based on Gender in Violation of NYCHRL

119.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1

through 89 herein as though recited at length herein.

120.    Jones is an "employer" within the meaning of the NYCHRL.

121.    At all times pertinent herein, Plaintiff was an "employee" of Jones within the

meaning of the NYCHRL.

122.    Plaintiff, a female, is a member of a class protected by NYCHRL.

29

123.     Defendants intentionally discriminated against Plaintiff by taking the adverse actions referenced in paragraphs 1 through 89 herein solely on the basis of Plaintiff's gender.

124.     Defendants have discharged Plaintiff and have discriminated against Plaintiff with respect to terms, conditions and privileges of employment, as referenced in paragraphs 1 through 89 herein, on the basis of Plaintiff's gender, in violation of the NYCHRL.

125.     Upon information and belief, Defendants' discriminatory treatment of Plaintiff was part of a pattern and practice of intentional gender discrimination at Jones.

126.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 89 herein detrimentally affected Plaintiff.

127.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 89 herein would detrimentally affect a reasonable female in the same position as Plaintiff.

128.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 89 herein would detrimentally affect a reasonable female in the same position as Plaintiff.

129.     The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 89 herein occurred in, and/or had an impact felt in, the City and State of New York.

130.     Defendants Messrs. Cohen, Cunningham, Mazzullo, Hill, and Chmielewski were supervisory employees of Jones and engaged in, aided and abetted, and exercised managerial and/or supervisory control over, the discriminatory actions referenced in paragraphs 1 through 89 herein and, therefore, are individually liable for the unlawful discrimination complained of herein.

131.    Defendants have committed the unlawful acts referenced in this Third Cause of Action with malice and/or with reckless indifference to the protected rights of Plaintiff.

132.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and other damages, including, but not limited to, pain and suffering, humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and damage to reputation, as a result of Jones' discriminatory acts unless and until this Court grants the relief requested herein.

133.    Defendants failed to exercise reasonable care to prevent and correct promptly the unlawful discrimination referenced in paragraphs 1 through 89 herein.  Defendants did not offer, and Plaintiff did not fail to take advantage of, any legitimate opportunities to prevent or correct the unlawful discrimination referenced in paragraphs 1 to 89 herein.  Defendants therefore are liable for the unlawful discrimination complained of herein.

134.    No previous application has been made for the relief requested herein.

## AS AND FOR A FOURTH CAUSE OF ACTION (As Against Jones)

## Unlawful Retaliation in Violation of Title VII

135.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 89 herein as if recited at length herein.

136.    Plaintiff engaged in protected activity by complaining to Jones, as referenced in paragraphs 1 through 89 herein, about the sexual harassment and sexually hostile work environment to which she was subjected.

137.    In response to Plaintiff's complaints referenced in paragraphs 1 to 89 herein, Jones harassed Plaintiff and subjected her to adverse employment actions, including, but not

limited to, terminating her employment, as referenced in paragraphs 1 to 89 herein.  The

harassment and adverse actions referenced in paragraphs 1 to 89 herein materially altered the

terms and conditions of Plaintiff's employment at Jones.

138.    Upon information and belief, Jones harassed Plaintiff and subjected her to adverse

employment actions, as referenced in paragraphs 1 to 89 herein, in retaliation for Plaintiff's

opposition to the sexual harassment and sexually hostile work environment at Jones and in order

to discourage Plaintiff and other female employees from opposing Jones' sexually hostile work

environment and unlawful discriminatory employment practices.

139.    The intentional discrimination against Plaintiff referenced in paragraphs 1 through

89 herein would detrimentally affect a reasonable female in the same position as Plaintiff.

140.    The intentional discrimination, hostile work environment and retaliation

referenced in paragraphs 1 through 89 herein occurred in, and/or had an impact felt in, the City

and State of New York.

141.    In violation of 42 U.S.C. § 2000e-3, Jones has terminated Plaintiff and has

discriminated against Plaintiff with respect to terms, conditions and privileges of her

employment, on the basis of her opposition to discriminatory practices prohibited by 42 U.S.C. §

2000e-2.

142.    Jones committed the unlawful acts referenced in this Fourth Cause of Action with

malice and/or with reckless indifference to the federally protected rights of Plaintiff.

143.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable

injury, monetary damages and other damages, including, but not limited to, pain and suffering,

humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and

damage to reputation, as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

144.   No previous application has been made for the relief requested herein.

### AS AND FOR A FIFTH CAUSE OF ACTION (As Against All Defendants)

### Unlawful Retaliation in Violation of the NYSHRL

145.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 89 herein as if recited at length herein.

146.   Plaintiff engaged in protected activity by complaining to Defendants, as referenced in paragraphs 1 through 89 herein, about the sexual harassment and sexually hostile work environment to which she was subjected.

147.   In response to Plaintiff's complaints referenced in paragraphs 1 to 89 herein, Defendants harassed Plaintiff and subjected her to adverse employment actions, including, but not limited to, terminating her employment, as referenced in paragraphs 1 to 89 herein.  The harassment and adverse actions referenced in paragraphs 1 to 89 herein materially altered the terms and conditions of Plaintiff's employment at Jones.

148.   Upon information and belief, Defendants harassed Plaintiff and subjected her to adverse employment actions, as referenced in paragraphs 1 to 89 herein, in retaliation for Plaintiff's opposition to the sexual harassment and sexually hostile work environment at Jones and in order to discourage Plaintiff and other female employees from opposing Jones' sexually hostile work environment and unlawful discriminatory employment practices.

149.   The intentional discrimination against Plaintiff referenced in paragraphs 1 through 89 herein would detrimentally affect a reasonable female in the same position as Plaintiff.

150.    The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 89 herein occurred in, and/or had an impact felt in, the City and State of New York.

151.    In violation of NYSHRL § 296 (7) Jones has terminated Plaintiff and has discriminated against Plaintiff with respect to terms, conditions and privileges of her employment, on the basis of her opposition to discriminatory practices prohibited by the NYSHRL § 296 *et seq.*

152.    Defendants committed the unlawful acts referenced in this Fifth Cause of Action with malice and/or with reckless indifference to the protected rights of Plaintiff.

153.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and other damages, including, but not limited to, pain and suffering, humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and damage to reputation, as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

154.    No previous application has been made for the relief requested herein.

### AS AND FOR A SIXTH CAUSE OF ACTION (As Against All Defendants)
### Unlawful Retaliation in Violation of the NYCHRL

155.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 89 herein as if recited at length herein.

156.    Plaintiff engaged in protected activity by complaining to Defendants, as referenced in paragraphs 1 through 89 herein, about the sexual harassment and sexually hostile work environment to which she was subjected.

34

157.    In response to Plaintiff's complaints referenced in paragraphs 1 to 89, Defendants harassed Plaintiff and subjected her to adverse employment actions, including, but not limited to, terminating her employment, as referenced in paragraphs 1 to 89 herein.  The harassment and adverse actions referenced in paragraphs 1 to 89 herein materially altered the terms and conditions of Plaintiff's employment at Jones.

158.    Upon information and belief, Defendants harassed Plaintiff and subjected her to adverse employment actions, as referenced in paragraphs 1 to 89 herein, in retaliation for Plaintiff's opposition to the sexual harassment and sexually hostile work environment at Jones and in order to discourage Plaintiff and other female employees from opposing Jones' sexually hostile work environment and unlawful discriminatory employment practices.

159.    The intentional discrimination against Plaintiff referenced in paragraphs 1 through 89 herein would detrimentally affect a reasonable female in the same position as Plaintiff.

160.    The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 89 herein occurred in, and/or had an impact felt in, the City and State of New York.

161.    In violation of NYCHRL Jones has terminated Plaintiff and has discriminated against Plaintiff with respect to terms, conditions and privileges of her employment, on the basis of her opposition to discriminatory practices prohibited by the NYCHRL § 8-107(7).

162.    Defendants committed the unlawful acts referenced in this Sixth Cause of Action with malice and/or with reckless indifference to the protected rights of Plaintiff.

163.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and other damages, including, but not limited to, pain and suffering,

humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and damage to reputation, as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

164.    No previous application has been made for the relief requested herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully respects that this Court enter a Judgment:

(a) declaring that the acts and practices complained of herein are in violation of Title VII, the NYSHRL and the NYCHRL;

(b) enjoining and restraining permanently the violations complained of herein;

(c) directing Defendants to provide Plaintiff with back pay, front pay and benefits that will place her in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment, and that will make her whole for all earnings and benefits she would have received but for Defendants' discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, commissions, pension benefits, life and accident insurance benefits, profit sharing benefits, and all other lost compensation and benefits;

(d) enjoining Defendants from harassing or engaging in any acts of reprisal or retaliation against Plaintiff for seeking to obtain her statutory rights to not be discriminated against on the basis of sex and to not be retaliated against for her protected complaints and objections, and from otherwise interfering with the rights of Plaintiff;

(e) directing Defendants to take such affirmative action as is necessary to assure that the effects of the unlawful employment practices complained of herein are eliminated and do not continue to affect Plaintiff's employment opportunities;

(f) directing Defendants to pay Plaintiff additional amounts of compensatory and punitive damages for, among other things, pain and suffering, humiliation, mental anguish and damage to reputation, as provided for in 42 U.S.C. § 1981a(a)(1), 42 U.S.C. § 2000e-5(g), N.Y. Exec. Law §§ 297(4), (9) and (10), and N.Y.C. Admin. Code § 8-502;

(g) awarding Plaintiff the costs of this action together with reasonable attorneys' fees, as provided for in 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), N.Y. Exec. Law §§ 297(4), (9) and (10), and N.Y.C. Admin. Code § 8-502; and

(h) granting such other and further relief as this Court deems necessary and proper.

Dated: December 12, 2019
New York, New York

STULBERG & WALSH, LLP
Attorneys for Plaintiff

By: _____/s/_____
Robert B. Stulberg (RS2734)
Zachary R. Bergman (ZB2811)
One Penn Plaza, Suite 2601
New York, New York 10119
(212) 268-1000

**DEMAND FOR JURY TRIAL**

Plaintiff, by and through his above-signed counsel, hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in the above-captioned action.