**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: __9/30/2020__

| | |
|---|---|
| **KRAIEM,** | |
| **Plaintiff,** | **1:19-cv-05160 (ALC)** |
| -against- | **OPINION AND ORDER** |
| **JONESTRADING INSTITUTIONAL SERVICES LLC., ET AL.,** | |
| **Defendants.** | |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Nefissa Kraiem, a French citizen and resident of London, brings this claim for discrimination based on gender and retaliation in violation of Title VII, New York State Human Rights Law, and New York City Human Rights law against JonesTrading International Limited ("JTIL"), JonesTrading Institutional Service LCC ("JTIS") and several employees of these organizations. Kraiem catalogs discrimination and retaliation that took place beginning in July 2016, when Kraiem was hired by JTIL in London U.K., until her alleged constructive termination on January 15, 2018 in London, U.K. The allegations in the First Amended Complaint span continents—occurring not only in London, but also in Abu Dhabi, UAE; Rome, Italy; and in Dallas, Texas, Greenwich Connecticut and New York, New York here in the United States. Though Kraiem has asserted that she only seeks relief for acts occurring in the U.S. from this Court, *See* Surreply at 8 ("As Mr. Tolley notes, Plaintiff commenced this proceeding first, and it involves claims under U.S. law, relating to conduct which occurred in the U.S., which she did not assert before the U.K. Employment tribunal."); *see also* Transcript of November 14, 2019 Hearing, ECF No. 39 at 3:9-4:4; 4:9-16, she also seeks to recover for her alleged constructive termination in London.

Defendants move to dismiss these claims on *forum non-conveniens* grounds based on a forum selection clause in Kraiem's employment contract with JTIL, for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, as well as for failure to state a claim under Rule 12(b)(6).

For reasons explained in full below, the Court GRANTS Defendants' motion in part and DENIES it in part.

## BACKGROUND

On May 25, 2016, Kraiem signed a contract of employment to be a trader with JTIL. JTIL is a foreign broker-dealer incorporated in England and Wales. JTIS, of which JTIL is a wholly owned subsidiary, is a Delaware limited liability company with its principal place of business in Westlake Village, California, which does business at a New York, New York office. The individual Defendants—Schlomo Cohen, Gary Cunningham, David Mazzullo, Alan Hill and Steven Chmielewski—work for these companies, which the FAC refers to collectively as "Jones". Cohen was employed by Jones as its Managing Director, Head of Investment Banking Equities and Capital Markets, and worked primarily in New York. Cunningham, Kraiem's direct supervisor at JTIL, was the Managing Director and Head of Global Sales for Jones. Mazzullo served as the President and Head of Global Sales for Jones and as a Director on the Jones Board. Hill was the Chief Executive Officer for Jones. Chmielewski was General Counsel to Jones.

Though JTIL and JTIS are separate entities, Kraiem alleges they are a single employer. While the Court need not accept this legal conclusion, it must accept as true the well pleaded facts that underlie it. Specifically, Kraiem alleges that "JTIL and JTIS have worked in tandem and under common management", as shown by their being "listed on the same 'JonesTrading' website under

a drop-down menu entitled, 'Our Companies.'" FAC ¶ 12. She further alleges that "[a]t all pertinent times, Jones traders in the U.K. [] primarily serviced U.S. based clients, many of whom are headquartered in New York City" under the supervision of Jones U.S. employees. FAC ¶ 14. According to Kraiem, "many of [her] clients and accounts were based in the U.S.," including her largest account. FAC ¶ 9. As further proof that the companies are one, Kraiem points to the fact that "JTIS and JTIL used a centralized Human Resources consultant, Mary Moser, SHRM-CP". FAC ¶ 16. Plaintiff also points to a provision in her employment contract that "permitted Jones, at any time, to transfer her employment contract, at its sole discretion, to any holding company or subsidiary of JTIL or JTIS, or to any associated employer of JTIL." FAC ¶ 17.

Though Kraiem's contract states that she would "normally be based at the Employer's London office at 1 Berkeley Street, London", the contract clearly anticipated that Kraiem would travel as part of her work. ECF No. 46-2 ¶ 5. It indicated that she might be "required to be based at any other premises at which the Employer carries on its business now or in the future", ECF No. 46-2 ¶ 5, that "The Company may at its sole discretion transfer the Contract to any [Jones] Group Company at any time", ECF No. 46-2 ¶ 42, and that she might have to "travel to such places (whether within or outside the U.K.) as the Employer requires [her] to in the performance of [her] duties", ECF No. 46-2 ¶ 2. However, it also indicated that Kraiem would "not be required to work outside the United Kingdom for any continuous period of more than one month." ECF No. 46-2 ¶ 6. It also said that "[t]he Contract shall be governed by the law of England and Wales and the parties submit to the exclusive jurisdiction of the English courts." ECF No. 46-2 ¶ 43.

Kraiem alleges that, virtually from the time she arrived at JTIL, she "was subjected to a severe and pervasive hostile work environment, in which male employees, including senior managers, repeatedly sexually harassed her". FAC ¶ 5. Her direct manager in the London office,

Cunningham, made inappropriate, infantilizing or sexualizing comments about Kraiem to co-workers and clients, suggesting she was unprofessional or used her appearance to advance at work. She also alleges that Cunningham "regularly assigned U.S. accounts to Plaintiffs male peers—even assigning one such account to a non-client-facing male employee—but never once gave Plaintiff such an assignment, unless a client specifically requested her help." FAC ¶ 41. Kraiem also describes Jones employees in New York ogling photos of her, and employees in London "shar[ing] photographs and videos of, among other things, scantily clad women, sex shops, articles concerning a sex dungeon, bigoted and racist memes, and misogynistic memes commenting on the physical appearance of females". FAC ¶ 46.

The alleged harassment and retaliation that occurred in the U.S. took place in Dallas, Texas in April 2017, Greenwich, Connecticut in May 2017, and New York, New York from July 10 to July 16, 2017.

Kraiem attended a Jones event in Dallas, Texas on or about April 27, 2017. During that trip, Mazzullo, the President of Sales, made inappropriate advances on Kraiem. He "unexpectedly hugged [her], grabbed her waist", and made statements to other male employees like "Look at her, guys. Who would not trade with her? She is such a beauty' and "I am sure it is not that hard for you to get clients to trade". FAC ¶ 49. Later that day, when Kraiem was heading back to her room after declining to go to a strip club with her co-workers, "Mazzullo followed her to her hotel, grabbed her, asked where her room was, and implored her to go to the club". FAC ¶ 50. When she declined, he "followed her to her door and asked if he could return later to 'say good-bye.'" FAC ¶ 50.

During that same Dallas trip, Kraiem's romantic relationship with another employee of Jones, non-party Tim O'neil, became public. FAC ¶ 53. The management team disallowed O'Neil

from continuing to have a relationship with Kraiem, and referred to her as a "bad woman with an agenda". FAC ¶ 53.

In early May, Kraiem complained to Cunningham about Mazzullo's conduct in Dallas. Cunningham "brushed Plaintiff's complaint off as business as usual", remarking that the behavior was "Classic Dave" and "of course" he "was going to try to come to her room". FAC ¶ 55. In mid-May, approximately two weeks after the Dallas trip, in Jones' Greenwich, Connecticut office, "a Jones employee referred to Plaintiffs looks, prompting [] Mazzullo to say, in words or effect, that Plaintiff was 'not his type.' In response, [] Cunningham chided [] Mazzullo, saying in words or effect, that he had 'heard otherwise' and that [] Mazzullo had followed Plaintiff to her hotel room in Dallas." FAC ¶ 55. It is unclear if Plaintiff was present for this exchange.

During a July 10 through 16, 2017 trip to New York, Plaintiff alleges that she was ostracized and gossiped about by her co-workers because of her prior relationship with O'Neil, which was revealed in Dallas, and her complaint to Cunningham about Mazzullo. FAC ¶¶ 57-58. She also reports that co-workers again ogled photos of her. FAC ¶ 59. Kraiem also alleges two incidents at client dinners.

On July 11, 2017, Cunningham invited her to a client dinner. He retracted the invitation by messaging Kraiem "that the dress code was 'cool and sexy. So you better not come.'" FAC ¶ 62. Kraiem attended the dinner anyway, and Cunningham "introduced her to clients, in words or effect, as the head of 'fashion' and 'entertainment' and 'occasionally [a] trader'" FAC ¶ 62. Kraiem alleges that Cunningham asked her if her dress was lingerie or a real dress and said, in words or effect, "I don't even see how you can wear underwear under that." FAC ¶ 63. He also had Kraiem take a photo with the client, which he sent to other co-workers suggesting that the client would change coverage to Kraiem. FAC ¶ 64. Later that night, Kraiem confronted Cunningham because

5

"he habitually made her look bad in front of clients, picked on her, and used her as a punching bag." FAC ¶ 65. Cunningham apologized that night, and sent Kraiem a message the following day saying, "I listened to everything you said last night. You are truly amazing and I will tell you that every other day." FAC ¶ 66.

On July 14, 2017, while still in New York, Kraiem agreed to go to drinks with a client with Cohen. While at the bar, the client propositioned Kraiem, saying something like "come with me to the toilet and I'll go down on you." FAC ¶ 60. When Plaintiff reported this lewd statement to Cohen, he apologized but made light of it, saying, in words or effect, "I'll request a big ticket from him [*i.e.,* the client] on Monday". FAC ¶ 60. The following day, Cohen joked about the incident at the office, and took no further steps.

Despite the conversation with Cunningham in New York about his unfair treatment, Kraiem alleges that Cunningham became increasingly hostile upon their return to London. In late August, Plaintiff told Cunningham that she was interested in filing a Human Resources complaint. FAC ¶ 74. Cunningham forwarded her an email on August 29, 2017, perhaps inadvertently as it was titled "Draft email to Nefissa Kraiem", that said "you clearly have a unique style with the accounts that you speak to and maybe there is a better firm out there that can harness your talents but if you decide to stay, please know you will have our full support for as long as your behaviour warrants it." FAC ¶ 74.

Plaintiff alleges that after that, Defendants planned to move the office to Gerrards Cross, two hours away from London, to constructively discharge her. FAC ¶ 78. "On December 22, 2017, Jones sent Plaintiff a proposed revised contract, stating that the firm intended to move to Gerrards Cross by January 31, 2018, and conditioning her continued employment on her agreement to move

to that location. Plaintiff refused to sign the contract, and by a January 15, 2018 letter, was informed that her employment had been terminated." FAC ¶ 84.

Plaintiff sought relief for the above violations in U.S and U.K courts. The U.K. proceeding was against JTIL and Cunningham, and sought relief under U.K. law for violations that occurred in the U.K. Opp. at 7. On March 22, 2019, Kraiem withdrew her U.K.-based claims with prejudice. Opp. at 8.

On May 8, 2018, Plaintiff filed a Charge of Discrimination against Jones with the United States Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights (NYSDHR), complaining of the acts of sexual discrimination and retaliation in the First Amended Complaint. FAC ¶ 25. On February 15, 2019, the NYSDHR granted Plaintiff a Dismissal for Administrative Convenience. FAC ¶ 26. On February 28, 2019, the EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on March 4, 2019. FAC ¶ 27.

On May 31, 2019, Kraiem initiated the instant action. ECF No. 1. The operative First Amended Complaint was filed on December 12, 2019. Therein, Kraiem seeks relief for discrimination based on sex and retaliation in violation of Title VII against JTIS and JTIL; and discrimination based on gender and retaliation in violation of the New York State Human Rights Law and New York City Human Rights Law against all defendants.

On January 22, 2020, Defendants moved to dismiss the First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing for dismissal (1) based on *forum non-conveniens*; (2) because Plaintiff fails to plead that JTIL and JTIS are a "single employer"; (3) because Plaintiff fails to plead impact in New York State or New York City; (4) because Plaintiff fails to plead a cause of action for retaliation; and (5) for lack of subject matter

jurisdiction. On April 29, 2020, Plaintiff opposed this motion. By amended memorandum of law

filed on May 7, 2020, Plaintiff argued that: (1) the Court does have subject matter jurisdiction; (2)

the forum selection clause does not cover Kraiem's statutory discrimination claims, does not apply

to defendants besides JTIL, and contravenes public policies of this forum; (3) the FAC adequately

pleads JTIL and JTIS are a single-employer; (4) that the FAC adequately pleads state and local

law claims; and (5) adequately pleads retaliation under Title VII. On June 29, 2020, Defendants

replied. Plaintiff filed a sur-reply on July 22, 2020.

### STANDARD OF REVIEW

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v.*

*United States*, 201 F.3d 110, 113 (2d Cir. 2000). In resolving a motion to dismiss for lack of subject

matter jurisdiction, the Court may consider affidavits and other material beyond the pleading to

resolve jurisdictional questions. *See Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d

Cir. 2008). The Court must accept as true the factual allegations contained in the Complaint, but

it will not draw argumentative inferences in favor of Plaintiff because subject matter jurisdiction

must be shown affirmatively. *See id.*; *Atlanta Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d

196, 198 (2d Cir. 1998); *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).

The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the

evidence. *Morrison*, 547 F.3d at 170.

On a Rule 12(b)(6) motion, the court must "assume all 'well-pleaded factual allegations'

to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'" *Selevan v.*

*New York Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

679 (2009)). Allegations that are "no more than conclusions[] are not entitled to the assumption of

truth," and "'naked assertion[s]' devoid of 'further factual enhancement'" or "the defendant-unlawfully-harmed-me accusation[s]" are not sufficient to show that a plaintiff is entitled to relief. *Iqbal*, 556 U.S. at 678-79 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 555, 557 (2007)). Nor must a court accept as true "legal conclusions" or "a legal conclusion couched as a factual allegation." *Id.* "We include in this analysis not only the assertions made within the four corners of the complaint itself, but also those contained in documents attached to the pleadings or in documents incorporated by reference." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (citing *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir. 1998); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).

## REGULATORY FRAMEWORK

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . . ." 42 U.S.C. § 2000-e(2)(a)(1). Title VII's protections extend to American citizens working abroad. 42 U.S.C. § 2111(4) ("With respect to employment in a foreign country, [the term 'employee'] includes an individual who is a citizen of the United States."). The statute also protects non-citizens working within the United States. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973) ("Title VII was clearly intended to apply with respect to the employment of aliens inside any State."). However, Congress did not extend the protections of Title VII to non-citizens employed outside of the United States. The statute specifically provides that "[t]his subchapter shall not apply to an employer with respect to the employment of aliens outside any State. . . ." 42 U.S.C. § 2000e–1(a); *see also Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 298 n.2 (2d Cir. 2006) ("Both Title VII, 42 U.S.C. § 2000e *et seq.*, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, provide, in

pertinent part, that '[w]ith respect to employment in a foreign country, [the term 'employee'] includes an individual who is a citizen of the United States." 42 U.S.C. §§ 2000e(f), 12111(4)'.").

Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency. 42 U.S.C. § 2000e-5. In addition, the claimant must make the EEOC filing within 300 days of the alleged discriminatory conduct and, before bringing suit, must receive a "Notice of Right to Sue" letter from the EEOC. *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)).

Under Title VII, "[t]o survive a motion to dismiss, a plaintiff need only establish 'a prima facie case of sex discrimination by demonstrating that (1) [he] was within the protected class; (2) [he] was qualified for the position; (3) [he] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.'" *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019). "If a plaintiff successfully establishes a prima facie case, the burden shifts to the employer at the summary judgment stage 'to articulate some legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* "Finally, if the employer carries that burden, a plaintiff must submit admissible evidence from which a finder of fact could 'infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Id.* In short, at this stage, a plaintiff need only allege facts that give "plausible support to a minimal inference of discriminatory motivation." *Id.*

Title VII also includes an anti-retaliation provision that makes it unlawful "for an employer to discriminate against any . . . employee[] . . . because [that individual] opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). To establish a presumption of retaliation at the initial stage of a Title VII litigation, a plaintiff must present evidence that shows "(1)

participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 315-16 (2d Cir. 2015) (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

The standards for evaluating hostile work environment and retaliation claims are identical under Title VII, the NYSHRL and NYCHRL. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000)). However, both the NYSHRL and NYCHRL are more protective in other regards. Both provide less stringent statutes of limitations than those applicable under federal law. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007). Moreover, the NYSHRL and NYCHRL permit suits against individuals, while Title VII does not. *See Feingold v. New York*, 366 F.3d 138, 157-59 (2d Cir. 2004).

The NYSHRL makes it unlawful for an employer to discriminate on the basis of, *inter alia*, race, creed, color, or sexual orientation. *See* N.Y. Exec. Law § 296. A supervisor is an "employer" for purposes of establishing liability under the NYSHRL if that supervisor "actually participates in the conduct giving rise to [the] discrimination." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). In addition, the NYSHRL states that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296(6). The Second Circuit has construed this language to allow a co-worker who "actually participates in the conduct giving rise to a discrimination claim" to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff. *Tomka*, 66 F.3d at 1317. "The same

11

standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is 'virtually identical.'" *Feingold v. New York*, 366 F.3d 138, 158-59 (2d Cir. 2004) (collecting cases).

However, a plaintiff must "plead and prove that the alleged discriminatory conduct had an impact" within the state and city respectively to receive the protections of the NYSHRL and NYCHRL. *McLeod v. Jewish Guild For The Blind*, 864 F.3d 154, 157 (2d Cir. 2017) (citing *Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 289 (2010)). New York State courts lack subject matter jurisdiction over claims brought under the NYCHRL and the NYSHRL by a non-resident plaintiff, when the alleged discriminatory conduct did not have an "impact" on the plaintiff within New York City (regarding the NYCHRL) and within New York State (regarding the NYSHRL). *Hoffman,* 15 N.Y.3d 285 at 289.

DISCUSSION

This opinion will proceed—roughly—from the simplest arguments for dismissal advanced by Defendants to the most complicated. First, the Court will consider to what extent Kraiem's claims are time-barred under Title VII or else beyond the geographic scope of the civil rights laws she seeks relief under. As detailed below, the Court concludes Kraiem's claims in Dallas, Greenwich and London are either time barred under Title VII's statute of limitations or outside of the protection of Title VII (which does not protect non-U.S. citizens employed abroad), NYSHRL, and NYCHRL (which require "impact" in the state and city respectively). The exception is that to the extent the Dallas and Greenwich events are encompassed in a hostile work environment claim, they may be timely.

This narrows Kraiem's viable claims to events during her business trip to New York City, and a hostile work environment related to that trip and encompassing events in Dallas and Greenwich. The Court concludes that Kraiem has pleaded that JTIS and JTIL are a single employer, such that she may seek to hold JTIS liable for incidents of discrimination and retaliation, despite the lack of a formal employment relationship. However, Kraiem has not pleaded that Cohen and Cunningham were personally involved in retaliation during the New York City trip, and therefore may not seek to hold them personally liable under NYSHRL and NYCHRL for retaliation. Next, the Court considers the impact, if any, of the forum selection clause in Kraiem's employment contract with JTIL. The Court concludes that the forum selection clause mandates that Kraiem bring any discrimination and retaliation claim against JTIL and its employee, Cunningham, in the U.K. JTIS, and its employee, Cohen, may not invoke this clause.

In sum, the Court GRANTS Defendants' motion to dismiss as to all London events and much of the Dallas and Greenwich events. However, it denies Defendants' motion to dismiss Kraiem's Title VII claims against JTIS and JTIL for discrimination and retaliation during her July 2017 New York City business trip, and for a hostile work environment that encompasses events in Dallas and Greenwich. The Court also denies Defendants' motion to dismiss Kraiem's NYSHRL and NYCHRL claims against JTIS, JTIL, Cohen and Cunningham during the New York City trip, except that it dismisses the retaliation claims against Cohen and Cunningham. However, in light of its conclusion that a valid, enforceable forum selection clause in Kraiem's JTIL employment agreement requires that claims against JTIL and its employee, Cunningham, be brought in the U.K., the Court dismisses claims against those two Defendants on *forum non-conveniens* grounds.

1.  Timeliness of Allegations Under Title VII

As an initial matter, the Court considers to what degree Plaintiff's Title VII claims are time

barred. Defendants argue that Plaintiff's claims earlier than 300 days before her filing a complaint

with the EEOC are untimely. The Court agrees.

"Title VII requires that individuals aggrieved by acts of discrimination file a charge with

the EEOC within 180 days or, in states like New York that have local administrative mechanisms

for pursuing discrimination claims, 300 days after the alleged unlawful employment practice

occurred." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78-79 (2d Cir. 2015) (citing

42 U.S.C. § 2000e-5(e)(1)) (internal quotes omitted). The Supreme Court has held that "practice"

in this context refers to "a discrete act" or "single occurrence," and that "a discrete retaliatory or

discriminatory act 'occurred' on the day that it 'happened.'" *Id.* (citing *National Railroad Passenger*

*Corp. v. Morgan*, 536 U.S. 101, 110-11 (2002)). Consequently, "discrete discriminatory acts are

not actionable if time barred, even when they are related to acts alleged in timely filed charges."

*Id.* (citing *National Railroad Passenger*, 536 U.S at 113).

"Hostile environment claims are different in kind from discrete acts.  Their very nature

involves repeated conduct." *National Railroad Passenger*, 536 U.S at 115.  Under the "continuing

violation" doctrine, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident

of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of

discrimination under that policy will be timely even if they would be untimely standing alone."

*Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 156 (2d Cir. 2012) (citation and

quotation marks omitted).  "Provided that *an* act contributing to the claim occurs within the filing

period, the entire time period of the hostile environment may be considered by a court for the

purposes of determining liability." *National Railroad Passenger*, 536 U.S at 117; *see also Davis-*

*Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) ("[A] charge alleging a hostile

work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice *and at least one act falls within the time period.*") (emphasis in original) (quoting *Morgan*, 536 U.S. at 122).

Here, Plaintiff filed her EEOC claim on May 8, 2018. Under the 300-day rule, this was timely as to discriminatory acts or acts of retaliation as early as July 12, 2017. The Dallas incidents occurred in April 2017. The Greenwich incident, which Kraiem may not have been present for, occurred in May 2017. Both are time barred.

Kraiem also pleads a hostile work environment claim. Defendants argue that the Court should not apply the continuing violation doctrine here because the incident Kraiem complained of in Dallas is not sufficiently connected to the incidents in New York. In particular, Defendants point to the lack of allegations regarding Mazzullo after April 2017. The Court disagrees that it can be conclusively said at this stage that Kraiem cannot show a connection between these incidents sufficient to warrant application of the continuing violation doctrine. Indeed, Kraiem alleges that Mazzullo's alleged sexual harassment led to her being ostracized and retaliated against in New York City.

In light of the above, Kraiem's Title VII claims for discrete acts of discrimination and relation in Dallas and Greenwich are dismissed as timebarred. Plaintiff's hostile work environment claim encompassing Kraiem's treatment in Dallas and Greenwich may proceed.

2. Viability of Title VII Claims for London Incidents

The Court now turns to whether Kraiem may seek relief for her constructive termination, which took place in London, under Title VII. The Court concludes that she may not.

15

To the degree Title VII applies abroad, its effect is limited to U.S. citizens. 42 U.S.C. § 2000e–1(a). However, under certain circumstances non-U.S. citizens that work both abroad and stateside have been deemed to be employed in the U.S. *See Bakeer v. Nippon Cargo Airlines, Co.*, No. 09 CV 3374 RRM, 2011 WL 3625103, at *31 (E.D.N.Y. July 25, 2011), *report and recommendation adopted*, No. 09-CV-3374 RRM CLP, 2011 WL 3625083 (E.D.N.Y. Aug. 12, 2011), and *report and recommendation adopted sub nom. Michaud v. Nippon Cargo Airlines*, Co., No. 09-CV-3375 RRM CLP, 2011 WL 5402642 (E.D.N.Y. Nov. 7, 2011), and *report and recommendation adopted sub nom. Frith v. Nippon Cargo Airlines, Co.*, No. 09-CV-3378 RRM CLP, 2011 WL 5429642 (E.D.N.Y. Nov. 7, 2011).

Courts have applied two tests to determine whether a non-citizen is employed in the United States. Some, like *Torrico v. Int'l Business Machines Corp.*, apply the "center of gravity" test. 213 F. Supp. 2d 390, 393-94 (S.D.N.Y. 2002). Under this test, a court considers factors "including (but not limited to) whether any employment relationship had, in fact, been created at the time of the alleged discrimination, and if so, where that employment relationship was created and the terms of employment were negotiated; the intent of the parties concerning the place of employment; the actual or contemplated duties, benefits, and reporting relationships for the position at issue; the particular locations in which the plaintiff performed those employment duties and received those benefits; the relative duration of the employee's assignments in various locations; the parties' domiciles; and the place where the allegedly discriminatory conduct took place." *Torrico*, 213 F. Supp. 2d at 403-04. There, the court held that the plaintiff, a non-U.S. citizen employed in New York, but assigned to a temporary position in Chile, could pursue Title VII claims because the "center of gravity" of his employment relationship was the United States. *Id.*

16

Other courts apply the "primary workstation test", as the D.C. Circuit did in *Shekoyan v. Sibley Int'l Corp.*, 217 F.Supp.2d 59, 68 (D.D.C. 2002), *aff'd*, 409 F.3d 414, 366 U.S. App. D.C. 144 (D.C. Cir. 2005). In *Shekoyan*, the plaintiff was hired to work in the Republic of Georgia but was "hired by, trained at, and reported to the defendant's corporate headquarters" in Washington, D.C. *Id.* at 62. After he was fired, plaintiff brought a Title VII claim alleging discrimination based on national origin. The court concluded that although plaintiff's position did have some connection to the United States, he could not bring a claim under Title VII because his "primary workstation and thus his place of employment" was the Republic of Georgia, where he was "specifically hired . . . . to work [and] . . . performed his primary work related duties. . . ." *Id.* The Second Circuit has not yet adopted the "center of gravity" or the "primary workstation" test.

Here, taking Kraiem's allegations as true, under either test, the Court concludes that Kraiem has not pleaded that she was employed in the United States. It is undisputed that Kraiem was hired in London, that she was "normally based" in the London office, and that her contract contemplated that she would "not be required to work outside the United Kingdom for any continuous period of more than one month." Kraiem did visit the Unites States during her time at Jones, including the special event in Dallas and July 2017 trip to New York City. She also alleges she cancelled a trip to visit clients in New York in December 2017. However, Kraiem largely pleads contacts with co-workers and supervisors in the United States by "squawk box", chat or internet while she was in London. Kraiem was also in London for the most intense allegations of retaliatory conduct by Cunningham, as well as at the time she was terminated. Taken together, these facts indicate that London was Kraiem's "primary workstation" and "center of gravity".

The Court therefore dismisses Kraiem's Title VII claim as to events occurring in London.

3. Impact in New York City

Next, the Court turns to the question of what among Plaintiff's claims may properly be considered under New York State and City Human Rights Law. The Court concludes it is only those allegations that occurred during Kraiem's July 2017 business trip to New York City.

"[T]he NYSHRL and NYCHRL [] afford protections unavailable under federal law to discrimination plaintiffs who can 'plead and prove that the alleged discriminatory conduct had an impact' within the state and city respectively". *McLeod v. Jewish Guild For The Blind*, 864 F.3d 154, 157 (2d Cir. 2017) (citing *Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 289 (2010)). This is because these provisions invoke the State's police power to "protect 'inhabitants' and persons 'within' the state" and "those who work in the city". *Hoffman v. Parade Publ'ns*, 15 N.Y.3d at 291. Applying this impact test, the Court of Appeals has held that the NYSHRL and NYCHRL do not reach a wrongful termination suit where the plaintiff lived in Atlanta, even where he alleged "he attended quarterly meetings in New York City, that the [organization] was managed from— and all corporate contracts were negotiated through—the New York City office, and that defendants' decision to terminate him was made and executed in New York City." *Id.* at 288. The Second Circuit has also rejected arguments that impact may be established by interactions with people in New York while the Plaintiff is elsewhere because "the impact of the employment action must be felt *by the plaintiff* in NYC". *Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 182-83 (2d Cir. 2016) (emphasis in original) (citing *Fried v. LVI Services, Inc.*, No. 10 Civ. 9308(JSR), 2011 WL 4633985, at *13 (S.D.N.Y. Oct. 4, 2011)). "To hold otherwise, such that the NYCHRL would cover employees who work at call centers outside the city and whose only contacts with NYC are phone conversations with persons in the city, would broaden the statute impermissibly beyond those 'who work in the city'". *Id.*

Here, Kraiem is admittedly a non-New York resident whose residence was London during the relevant time. For this Court to have subject matter jurisdiction over her claim under NYSHRL and NYCHRL the alleged discrimination and retaliation must have had an impact on her in New York State and City respectively. She pleads impact in New York by alleging (1) instances of harassment and retaliation during her July 2017 New York City trip, (2) harassing conduct by people located in New York City while she was in London or elsewhere, and (3) negative effects on her future career prospects in New York.

With *Hoffman* and *Vangas* in mind, the Court finds the second and third category of allegations bear no weight for Kraiem. As the Second Circuit explained in *Vangas*, concluding that impact was pleaded based on phone conversations with people in New York would impermissibly broaden the scope of protections of NYSHRL and NYCHRL. Pleading impact in New York City by unspecified future career prospects would also represent a similar, impermissible broadening of the scope of these laws. Kraiem cites two cases she claims support this approach: *Anderson v. HotelsAB, LLC*, 2015 WL 5008771, at *3 (S.D.N.Y. Aug. 24, 2015); *Chau v. Donovan*, 357 F. Supp. 3d 276, 283–84 (S.D.N.Y. 2019). They do not. Both are failure to hire cases, where the impact of the plaintiff was specifically tied to their being deprived a job in New York on discriminatory grounds. *See Anderson*, 2015WL 5008771, at *10-11 ("[a]lthough the alleged discriminatory conduct here ([the] decision not to hire Plaintiff) occurred outside the geographical bounds of New York City, Plaintiff's Complaint sufficiently alleges that Defendants' conduct had an impact with respect to her prospective employment responsibilities in New York City" because "Plaintiff [] alleged that she would have worked in New York for a period of seven months and that the requirements of the controller position would have required her to do so each year"); *see Chau v. Donovan*, 357 F. Supp. 3d 276, 283 (S.D.N.Y. 2019) ("Although Chau never worked in

New York City for Granger or Donovan, the job for which she alleges she was not hired in violation of the NYCHRL and NYSHRL would have offered her employment within New York City."). If impact can be shown by a mere hope to work in New York down the line, the flood gates would be open.

To the degree incidents of harassment or retaliation occurred while Kraiem was in New York City, the Court sees no reason those claims cannot proceed. At that time she was "within the state" and among "those who work in the city". *Hoffman v. Parade Publ'ns*, 15 N.Y.3d at 291. However, for the reasons above the Court dismisses the NYSHRL and NYCHRL claims based on conduct outside of New York. As a consequence, any individual defendant that is not alleged to have engaged in discrimination or retaliation in New York City is also dismissed from the case: David Mazzullo, Hill and Chmielewski. Cohen and Cunningham remain.

### 4.   JTIS as Kraiem's "Employer"

Next, the Court considers whether Kraiem has pleaded that JTIS was her employer, such that her claims may proceed against them despite the lack of a formal employment relationship. The Court concludes she has adequately pleaded that JTIS is her employer at this stage of the case.

In the context of Title VII, there are two "recognized doctrines that enable an employee in certain circumstances to assert employer liability against an entity that is not formally his or her employer." *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 197 (2d Cir. 2005). These doctrines are known as the "single employer" doctrine, and the "joint employer" doctrine. *Id*. Under the single employer doctrine, "separate corporations under common ownership and management . . . can be deemed to constitute a single enterprise." *Id*. at 198. This Circuit examines four factors in order to assess whether two nominally distinct entities are actually a single employer: "(1)

interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240-41 (2d Cir. 1995) (internal quotation marks omitted). "Although no one factor is determinative[,] control of labor relations is the central concern." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 227 (2d Cir. 2014) (citing *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996)).

Here, Kraiem alleges that JTIS was either her employer or else was a single-employer with JTIL. Kraiem's assertion that JTIS was her employer because her employment contract with JTIL stated that she could have been transferred to JTIS fails because Kraiem does not allege such transfer occurred. Her single-employer argument, on the other hand, fairs better. Kraiem's claim that JTIS is a single employer with JTIL is based on (1) the fact that JTIS and JTIL employees worked closely together on a daily basis, supported the same clients and accounts, and reported to the same supervisors; (2) that the companies had the same HR consultant, Mary Moser, and JTIS staff, such as Hill and Chmielewski, were involved in personnel decisions at JTIL, including those related to Kraiem; (3) and both JTIS and JTIL are owned by the same holding company, Jones & Associates, Inc. ("JA"). The Court concludes this adequately alleges that JTIL and JTIS are a single employer at this stage of the complaint.

5.  Stating a claim for retaliation

Having winnowed Kraiem's viable claims down to those in New York City during her July 2017 business trip and a hostile work environment encompassing her New York, Dallas and Greenwich allegations, the Court now considers whether she has pleaded retaliation as to each defendants during that time. The Court concludes she has not pleaded retaliation as to the individual defendants, Cohen and Cunningham.

To establish a presumption of retaliation at the initial stage of a Title VII litigation, a plaintiff must present evidence that shows "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 315-16 (2d Cir. 2015) (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). Under NYSHRL and NYCHRL a co-worker who "actually participates in the conduct giving rise to a discrimination claim" may be individually liable too. *Feingold*, 366 F.3d at 158-59.

Kraiem pleads that when she got to New York, she was ostracized and gossiped about by her co-workers because of her prior relationship with O'Neil, which was revealed in Dallas, and her complaint to Cunningham about Mazzullo. FAC ¶¶ 57-58. She also alleges specific acts by Cohen and Cunningham while courting clients. At one event with clients, Cohen made light of an unwanted sexual advance by client on Kraiem and did not inquire into it afterward. At another, Cunningham made comments about Kraiem's appearance and downplayed her competency to clients. While Kraiem has pleaded retaliation by her co-workers generally, which may suffice as to JTIS and JTIL, her allegations against Cohen and Cunningham do not show retaliation. Rather, taking the allegations as true, they are more of the same sexual discrimination that Kraiem alleges she experienced at Jones. They lack any obvious causal connection to the complaints Kraiem made to Cunningham after the Dallas trip.

The Court therefore dismisses Kraiem's claims for retaliation as to Cohen and Cunningham because Kraiem fails to allege they personally engaged in retaliatory conduct in New York.

6.   Forum Non-Conveniens

The Court now considers the impact of the forum selection clause in Kraiem's employment contract with JTIL. It reads: "The Contract shall be governed by the law of England and Wales and the parties submit to the exclusive jurisdiction of the English courts." ECF No. 46-2 ¶ 43. Its impact will be governed by the Court's answers to three questions: (1) whether the clause covers the discrimination and retaliation claims Kraiem brings; (2) if so, which defendants may enforce the clause, and; (3) whether enforcing the clause would violate an important public policy of this forum. For the reasons that follow, the Court concludes (1) that Kraiem's harassment and retaliation claims fall within the forum selection clause; (2) that JTIL and its employees may enforce the clause; and (3) that no important public policy is harmed by enforcing the clause. The Court therefore dismisses the remaining claims against JTIL and Cunningham on *forum non-conveniens* grounds.

The "appropriate way to enforce a forum selection clause pointing to a state or foreign forum is through the doctrine of *forum non-conveniens*." *Atlantic Marine Const. Co., Inc. v. US. Dist. Court of Western. Dist. of Texas*, 134 S.Ct. 568, 580 (2013). "Where the parties have contractually selected a forum" there is a "presumption in favor" of that forum. *Fasano v. Yu Yu*, 921 F.3d 333, 335 (2d Cir. 2019) (citing *Martinez v. Bloomberg LP*, 740 F.3d 211, 218 (2d Cir. 2014)). "[A] district court must consider three factors in determining whether the presumption of enforceability applies to a forum selection clause: whether (1) the clause was reasonably communicated to the party resisting its enforcement; (2) the clause is mandatory or permissive; and (3) the claims and parties to the dispute are subject to the clause." *Id.* (citing *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 721 (2d Cir. 2013)). When a court is "called upon to determine whether a particular forum selection clause is mandatory or permissive, or whether its scope encompasses the claims or parties involved in a certain suit, [it] appl[ies] the law

contractually selected by the parties." *Martinez*, 740 F.3d at 217 (citations omitted). "If the district court concludes that the presumption applies, it must then consider a fourth factor—whether the presumption of enforceability has been properly rebutted by 'a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Fasano v. Yu Yu*, 921 F.3d at 336 (quoting *Phillips*, 494 F.3d at 384). This fourth step, the *Bremen* test, from *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, (1972), asks whether the presumptively valid forum selection clause is invalid because "(1) its incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum in which suit is brought; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court." *Martinez*, 740 F.3d at 228. While federal law should be used to determine whether an otherwise mandatory and applicable forum clause is enforceable under *Bremen*, "[i]n answering the interpretive questions posed by parts two and three of the four-part framework, however, [courts] normally apply the body of law selected in an otherwise valid choice-of-law clause." *Martinez,* 740 F.3d at 217-18.

Here, Kraiem does not dispute that the clause was reasonably communicated to her or that it is mandatory. The parties disagree on whether the claims and parties in this matter are subject to the clause, and whether enforcement contravenes a strong public policy of this forum. The first two questions are governed by U.K. law; the third by the law of the U.S. and Second Circuit.

When interpreting jurisdictional clauses, U.K. courts start from the assumption that "there is no rational basis upon which businessmen would be likely to wish to have questions of the validity or enforceability of the contract decided by one tribunal and questions about its performance decided by another." *Fili Shipping Co. Ltd. v. Premium Nafta Prods. Ltd.*, [2007]

24

UKHL 40 [7]. Consequently, courts should presume that jurisdiction clauses encompass all disputes involving the relationship into which the contracting parties entered "unless the language makes it clear that certain questions were intended to be excluded. . . ." *Id*. [13].

These interpretive rules derive from *Fili Shipping Co. Ltd. v. Premium Nafta Prods. Ltd.*, [2007] UKHL 40, known as the "*Fiona Trust* case". This was a case in admiralty, where the claimant shipowners contended their charter agreement, which contained an arbitration clause, was procured by bribery and sought rescission. *Id*. [1]. Claimants argued that their claims were not subject to the arbitration clause because their claims, sounding in tort, were "not [] dispute[s] arising under the charter"; rather they challenged the circumstances under which the parties entered into the charter. *Id*. [4]. The Court of Appeal concluded to the contrary, holding that "any jurisdiction or arbitration clause in an international commercial contract should be liberally construed." *Fiona Trust & Holding Corp. v. Privalov*, [2007] EWCA (Civ) 20, [18]. The House of Lords (now the U.K. Supreme Court) affirmed, and enunciated the governing presumption above.

The instant forum selection clause states: "The Contract shall be governed by the law of England and Wales and the parties submit to the exclusive jurisdiction of the English courts." In keeping with the interpretive tools in *Fiona Trust* and a related U.K. Court of Appeal decision highlighted by Defendants' expert, *Deutsche Bank A.G. & Ors -v- Asia Pacific Broadband Wireless Communications Inc & Anr* [2008] EWCA Civ 1091, given the absence of any express reservation for harassment, discrimination or retaliation claims, the Court reads the forum selection clause in Kraiem's employment contract to include them.

Plaintiff concedes that *Fiona Trust* and *Deutsche Bank* are "authority for the proposition that: (1) In general, an arbitration clause or exclusive jurisdiction clause should be interpreted on

the basis that the parties would have intended that any dispute arising out of a relationship into which they had entered (or purported to enter) should be determined by the same tribunal, unless a contrary intention was clearly articulated [and] (2) One should not make fine distinctions between different forms of words used in such clauses." Tolley Opp. Decl. ¶ 21. Rather, Plaintiff's expert makes several arguments that have been considered and rejected by the Second Circuit in a similar context in *Martinez v. Bloomberg LP*. This Court finds these arguments unpersuasive as well.

     *First*, Plaintiff's expert points to several cases where the parties did not intend the *Fiona Trust* presumption to apply. These are cases where: "the parties ha[d] agreed to different types of dispute resolution under an agreement"; there was an exclusive jurisdiction clause in a related agreement, but not the one at issue; there was a non-exclusive claim jurisdictional clause; or the party sought to invoke rights assigned by a third party that was not party to an arbitration clause. Tolley Opp. Decl. ¶ 25. While these cases may demonstrate the limits of the *Fiona Trust* presumption, none of them are factually similar to the instant case. Nor is it clear why some parties contracting around the *Fiona Trust* presumption, which countenances parties doing so, weakens the presumption.

     *Second*, Plaintiff purports to "apply the reasoning" from the distinguishable cases to posit a new presumption for interpretation of jurisdictional clauses in employment contracts. Though it is not entirely clear what Plaintiff's expert deems the consistent thread of reasoning among the distinguishable cases to be, he concludes that "rational parties (whether businessmen or not) would not have intended that all their disputes arising out of the employment relationship would be decided by the same tribunal" and "would have expected that any dispute between them arising from the employment relationship would have to be resolved in two separate proceedings, one in

the employment tribunal and another in the courts." Tolley Opp. Decl. 26. The basis of this argument is that employees have a non-waivable right to bring certain employment disputes before the U.K. Employment Tribunal. This argument is unpersuasive for at least two reasons. *First*, it seems like an unsupported end run around *Fiona Trust*. *Second*, it is unclear why it would have the result that a party that agrees to a clause submitting to the "the exclusive jurisdiction of the English courts" is thereby permitted to seek relief in the United States. The more natural way to reconcile these things would be to conclude that Kraiem and JTIL could not have intended to waive access to the U.K. Employment Tribunal that could not be legally waived, or else that they intended "the exclusive jurisdiction of the English courts" to include the U.K. Employment Tribunals.

*Third*, Plaintiff makes a textualist argument, asserting that the sparse language of the clause in Kraiem's employment contract indicates that the parties did not intend it to have wide effect. Plaintiff asks the Court to draw the inference that the lack of mention of Employment Tribunals or "claims based on torts which arise independently of any claim for breach of contract" evinces an intention to exclude them from the jurisdictional clause. Tolley Opp. Decl. 30. But this turns *Fiona Trust*, which instructs courts to look for a "clearly articulated" intent to have disputes between contracting parties determined by different tribunals, on its head—without authority to support so doing. Tolley Opp. Decl. ¶ 21.

*Fourth*, Plaintiff's expert asserts the forum selection clause cannot cover Kraiem's claims because "a claim for discrimination is not based on the contract of employment, even if it relates to the termination of the contract." Tolley Opp. Decl. at 32. Plaintiff's point that these are statutory torts is well-taken. However, the Court does not agree that this fact disturbs the reasoning in *Fiona Trust*. In fact, *Fiona Trust* specifically considered whether claims other than breach-of-contract— specifically, torts of conspiracy, bribery and breach of fiduciary duty—fell within an arbitration

clause in a commercial contract and answered yes. Contrary to Plaintiffs' assertion, the Second Circuit's decision in *Martinez* took this into account as well. *See Martinez*, 740 F.3d at 226 ("Although under English law an employment discrimination claim is a claim for a 'statutory tort,' to bring a claim for employment discrimination an employee nevertheless 'must establish that she was employed and was dismissed from that employment, so that to that extent reliance must be placed on the contract of employment.'") Plaintiff's expert provides no support for the implication that contracting parties should be presumed to want to have statutory torts related to employment relationships decided in different fora than other claims solely because of source of law. And, *Fiona Trust* says to the contrary.

*Fifth*, Plaintiff's expert invokes the "*contra preferentem* principle of interpretation, whereby in the event of doubt or ambiguity, a contract should be construed more strongly against the grantor or maker." Tolley Opp. Decl. 34. This "principle only applies as a last resort, in the event that the interpretation of the contract cannot be resolved by the ordinary principles of construction." Tolley Opp. Decl. ¶ 34. The Court does not deem resort to this interpretive tool necessary.

The Court concludes that the forum selection clause, as interpreted via the *Fiona Trust* cannons Plaintiff's expert concedes direct broad interpretation of jurisdictional clauses and whose application Plaintiff's expert has not refuted, encompasses harassment and discrimination claims. The Court now turns to the second question of what defendants may enforce the forum selection clause. The Court concludes that only JTIL and its employees may do so.

Plaintiff argues that the only party entitled to rely on the forum selection clause is JTIL. In so doing, it points to two cases where a court declined to assume an affiliate company of a party could benefit from a forum selection clause without explicit language to that effect in the contract.

Tolley Opp. Decl. ¶¶ 35-37 (citing *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd*, [1999] 1 All ER (Comm) 237, and *Morgan Stanley & Co International plc v China Haisheng Juice Holdings Co Ltd*, [2009] EWHC 2409 (Comm), [2010] 2 All ER (Comm) 514). Defendants' expert does not directly refute these cases. Rather, Defendants' expert argues that "[a]ny lawyer properly instructed in the law, construing this contract, within the U.K., at the time it was made, would have known that the acts and omissions of any co-worker of [] Kraiem or agents of her employer would have been expected by the parties to be addressed within the English legal system." Redfern Decl. ¶ 52. This is because vicarious liability of employers for employees is well-established at common law and written into U.K. discrimination statutes. Redfern Decl. ¶ 52. Plaintiff's expert does not directly dispute this.

The Court therefore concludes that the forum selection clause may not be invoked by JTIS, but does cover the employees of JTIL, such as Cunningham. Having concluded that the forum selection clause does cover the discrimination and retaliation claims, and that JTIL and its employees may invoke it, the Court now considers whether there are strong policy reasons under U.S. law why it should not be enforced. The Court concludes there are not.

Plaintiff urges the Court not to enforce the clause based on the third *Bremen* factor, arguing that  enforcement contravenes a strong public policy of this forum. Specifically, Plaintiff argues that enforcing this forum selection clause would be contrary to the public policy of this forum in ensuring that individuals who suffer sexual harassment and discrimination in New York may seek redress under Title VII, and the State and City HRLs, in local courts and that Kriaem would be without remedy were the forum selection clause dismissed. The Court is not persuaded.

 "The presumptive enforceability of forum selection clauses reflects a strong federal public policy of its own," *Martinez*, 740 F.3d at 218. These clauses "further vital interests of the justice

system, including judicial economy and efficiency, ensure that parties will not be required to defend lawsuits in far-flung fora, and promote uniformity of result." *Magi XXI*, 714 F.3d at 722 (internal quotation marks, alterations, and citations omitted). Here, most of Kraiem's claim is not properly before this Court based on the very terms of Title VII, NYSHRL and NYCHRL. To the degree her claims may proceed under these laws, she is not without forum. She may seek relief from JTIS and Cohen as to discrimination and retaliation that occurred in New York City. There is therefore little tension between enforcing this forum selection clause and providing a forum for civil rights claims.

In sum, the Court concludes that the instant claims against JTIL and its employees are subject to the forum selection clause in Kraiem's JTIL employment contract. Finding no public policy grounds for not enforcing the clause, the Court dismisses the claims against JTIL and its employees on for*um non-conveniens* grounds.

CONCLUSION

For the reasons above, the Court GRANTS Defendants' motion to dismiss, ECF No. 44, in part and DENIES it in part. It is DENIED as to Kraiem's claims for discrimination and retaliation based on events during a 2017 business trip to New York City as to JTIS, pursuant to Title VII, NYSHRL, and NYCHRL. It is DENIED as to the Dallas and Greenwich allegations in so far as they are part of a hostile work environment claim related to the 2017 New York City business trip. It is also DENIED as to Kraiem's claims under NYSHRL and NYCHRL against Cohen for events during the 2017 New York business trip, except that the retaliation claim against Cohen is dismissed. The rest of Kraiem's claim is DISMISSED. The Clerk of Court is directed to terminate defendants besides JTIS and Cohen from the case. The Court GRANTS Kraiem leave to replead to correct the deficiencies identified in this Opinion and Order, if she wishes. The Parties are

directed to file a joint status report outlining how they would like to proceed with this case within

25 days of the date this Opinion and Order is issued.

**So Ordered.**
Dated: New York, New York
        September 30, 2020

_____
Hon. Andrew L. Carter, Jr.
United States District Judge