UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

NEFISSA KRAIEM,

               Plaintiff,

        - against -

JONESTRADING INSTITUTIONAL
SERVICES LLC., JONESTRADING
INTERNATIONAL LIMITED, SHLOMO
COHEN, GARY CUNNINGHAM, DAVID
MAZZULLO, ALAN HILL, and STEVEN
CHMIELEWSKI,

               Defendants.

----------------------------------------------------------X

**19 CV 5160 (ALC)**

**SECOND AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff Nefissa Kraiem ("Plaintiff"), by her attorneys, Stulberg & Walsh, LLP,

respectfully alleges as follows:

## **NATURE OF THIS ACTION**

      1.    Plaintiff is a former Equity Institutional Sales Trader employed by Defendant

JonesTrading Institutional Services LLC ("JTIS") and its wholly-owned subsidiary, Defendant

JonesTrading International Limited ("JTIL") (collectively, "Jones" or "the firm"), which are both

owned by the holding company Jones & Associates, Inc. ("JA").[1]  At Jones, Plaintiff reported to,

among others, Defendants Shlomo Cohen, Gary Cunningham, David Mazzullo, Alan Hill and

Steven Chmielewski.

---

[1] As set forth below, JTIL and JTIS are a "single employer" within the meaning of: Title VII of the Civil
Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the New York State
Human Rights Law, New York Executive Law §§ 296 *et seq.* ("NYSHRL"); and the New York City
Human Rights Law, New York City Administrative Code §§ 8-101 *et seq.* ("NYCHRL").

2.     Jones provides equity trading and brokerage services throughout the United States ("U.S."), Canada and Europe and is one of the largest independent sales trader-focused platforms in its industry, with a network of more than 100 registered representatives nationwide.  Jones purports to have "broad and deep" relationships with more than 1,500 institutions and hedge funds.

3.     Jones advertises that it has "one of the lowest turnover rates in the securities industry" and that it is "proud to say when new people arrive, 'Welcome to your last job.'" Jones, however, employs astonishingly few women as traders.  Upon information and belief, Jones employed no more than five female traders and analysts at all pertinent times, while employing more than 90 male traders and analysts at those times.  Additionally, at all pertinent times, Ms. Kraiem was the only female trader in Jones' London office, and Jones did not employ any females in its New York City office.  Plaintiff was expected to, and did, work out of and travel to Jones' New York City office when visiting, supporting and cultivating U.S.-based clients and accounts.

4.     As set forth more fully below, Plaintiff, at all pertinent times, worked side-by-side with Jones' U.S. traders and supervisors, co-managing and pursuing accounts of U.S.-based clients.  Many of those clients and traders were based in New York City, including Plaintiff's largest account, which she co-managed with Mr. Mazzullo.

5.     During her time at Jones, Plaintiff was subjected to a severe and pervasive hostile work environment, in which male employees, including senior managers, repeatedly sexually harassed her.  Plaintiff was bullied, demeaned, objectified, molested, propositioned, harassed and prostituted by Jones' management.  Plaintiff received worse treatment than her male colleagues

2

with respect to terms and conditions of her employment, and was regularly made the brunt of vile, sexist actions and jokes.

6.     Although Plaintiff complained internally about these conditions, Jones' employees continued to discriminate against her by permitting the unlawful sexual harassment to continue unchecked (by, among others, the very supervisors to whom she had complained), and by unlawfully terminating her employment.

7.     In addition to failing to address Plaintiff's repeated internal complaints about the discrimination and harassment she suffered at their hands, Defendants retaliated against Plaintiff for initiating legal proceedings.

8.     Jones' actions had a devastating impact on Plaintiff's immediate and prospective business prospects throughout the U.S., and particularly in New York City, where she felt the immediate and long-term adverse effects of Jones' vile, gendered and discriminatory actions and its retaliatory conduct.  Jones' actions, *inter alia*, severely damaged Plaintiff's emotional well-being, resulting in physical symptoms and causing Plaintiff to harbor suicidal thoughts, and undermined her ability to support and foster clients and accounts throughout the U.S., particularly in New York City.

9.     Plaintiff, thus, brings this Complaint against JTIS, JTIL, and Messrs. Cohen, Cunningham, Mazzullo, Hill and Chmielewski (collectively "Defendants"), as Defendants unlawfully discriminated against her because of her sex and gender and retaliated against her for making internal and external complaints about that discrimination in violation of Title VII, the NYSHRL and the NYCHRL.

3

## THE PARTIES

10.     Plaintiff is a female, and resides in the United Kingdom.  Plaintiff was employed by Jones from June 15, 2016 until she was unlawfully terminated.  Prior to joining Jones in 2008, Plaintiff earned certificates in English and Business Administration from McGill University in Montreal, Canada.  In 2011, Plaintiff earned her Bachelor's Degree in Private Law and her Master's Degree in International Law from the University of Paris, Pantheon Sorbonne.  From in or around June 2011 to in or around March 2012, she worked for UBS as a Prime Broker.  In or around September 2014, Plaintiff joined Market Securities as an Analyst in Jones' London, England office.  At Jones, many of Plaintiff's clients and accounts were based in the U.S., and particularly in New York City, where her largest account, which she co-managed with Mr. Mazzullo, was based.  Consequently, Plaintiff was required to, and did, travel throughout the United States, including to New York City, to conduct business on behalf of Jones.

11.     Jones supervisors, based throughout the U.S., including in New York City, managed and exercised supervisory control over Plaintiff.  Upon information and belief, JTIS is a U.S. company and a New York resident, and Jones maintains an office in the City and State of New York, at 757 3rd Avenue, 23rd Floor, New York, New York 10017.  Upon information and belief, JTIL is a wholly-owned subsidiary of JTIS and maintains an office at Building 1, Chalfont Park, Gerrards Cross, SL9 0BG, United Kingdom.  JTIS and JTIL are both owned by a holding company, JA.

12.     Jones is a "single employer" within the meaning of Title VII, the NYSHRL and the NYCHRL, and Jones has continuously employed at least fifteen employees.  At all pertinent times herein, Jones has been an employer engaged in an industry affecting commerce within the

meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).  At all

pertinent times, Jones also has been an employer within the meaning of Section 296 of the

NYSHRL, NY Exec L §§ 292(5) and 296, and Section 107 of the NYCHRL, Admin. Code §§ 8-

102 and 8-107.

13.     At all pertinent times, JTIL and JTIS have worked in tandem and under common

management.  Indicative of the high degree of interrelation between JTIL and JTIS, both entities

are listed on the same "JonesTrading" website under a drop-down menu entitled, "Our

Companies."  Jones advertises on its website that JTIL "was launched in order to expand the

JonesTrading model into the European Union" and that Jones opened an office in London to

"provide better cross-border service for both US and European clients of JonesTrading

International Limited and JonesTrading Institutional Services LLC."  Jones further advertises on

its website that it uses its trading model "to find liquidity in multiple asset classes around the

world."  Jones states further on its website that, in order to provide access to such global asset

classes, Jones offers and provides services "in the United States . . . through JonesTrading

Institutional Services LLC," and in "Europe . . .  through JonesTrading International Limited."

14.     Upon information and belief, Jones, at all pertinent times, has operated a satellite

office in the United Kingdom ("U.K.") because Jones' U.S. based traders cannot trade in foreign

markets.  Jones' U.K. office enables it to sell its products outside of the U.S.

15.     At all pertinent times, Jones traders in the U.K. have primarily serviced U.S.

based clients, many of whom are headquartered in New York City and are dependent on Jones'

U.S.-based employees.  At all pertinent times, traders in Jones' U.K. office, when servicing U.S.

5

clients and selling Jones' U.S. financial instruments, have operated under the supervision of Jones' U.S. traders.

16.     At all pertinent times, Jones' traders, across Jones' offices, have used "hoot-n-hollers" (a/k/a "squawk boxes") on their desks to interact globally with Jones' traders in its other offices and to coordinate business activities across markets.  At all pertinent times, those hoot-n-hollers have provided a permanent, open communication circuit between the firm's employees, and Jones has conducted daily firm-wide briefings across its offices on these devices.  Upon information and belief, Jones' U.K office could not operate if it were severed from Jones' U.S. operation.

17.     At all pertinent times, JTIS and JTIL used a centralized Human Resources consultant, Mary Moser, SHRM-CP.  Upon information and belief, at all pertinent times, Ms. Moser ran Jones' Human Resource department, used by both JTIS and JTIL.  Ms. Moser was provided a Jones' email address, and her email signature read, in pertinent part, "Human Resources Consultant for JonesTrading."  Upon information and belief, at all pertinent times, Defendants Cunningham, Hill and Chmielewski each communicated with Ms. Moser concerning the terms and conditions of Plaintiff's employment at Jones.[2]

18.     Plaintiff's employment contract with JTIL permitted Jones, at any time, to transfer her employment contract, at its sole discretion, to any holding company or subsidiary of JTIL or JTIS, or to any associated employer of JTIL.  Upon information and belief, Jones'

---

[2] After Plaintiff initiated the instant proceedings, Jones amended its website to state that Ms. Moser "joined JonesTrading in 2019 as Head of Human Resources after having been an independent consultant for JonesTrading group overseeing the employment, staffing, and benefits programs in the United States, Canada, and the United Kingdom."

employment contracts with other employees permit it, at its discretion, to transfer those employees' contracts, at any time, to other Jones entities.

19.     Mr. Cohen, at all pertinent times, was employed by Jones as its Managing Director, Head of Investment Banking Equities and Capital Markets, and had supervisory control over, and managed, Plaintiff.  Mr. Cohen primarily worked out of Jones' New York City office, from which he exercised his supervisory control over, and managed, Plaintiff.  Upon information and belief, Mr. Cohen, at all pertinent times, held the authority to hire and fire Jones' employees, supervise and control employee work schedules and/or conditions of employment, provide bonuses, and maintain employment records. Jones is strictly liable for his unlawful discriminatory and retaliatory conduct pursuant to the NYCHRL.

20.     Mr. Cunningham holds the title of the Managing Director, Head of Sales for Global Execution Services for JTIS, a title he has held since on or about January 1, 2018.  Prior to obtaining that title, Mr. Cunningham, at all pertinent times, held the title of JTIL's Chief Executive Officer.  At all pertinent times, he was employed by Jones and had supervisory control over, and managed, Plaintiff.  Upon information and belief, Mr. Cunningham, at all pertinent times, held the authority to hire and fire Jones' employees, supervise and control employee work schedules and/or conditions of employment, provide bonuses, and maintain employment records. Jones is strictly liable for his unlawful discriminatory and retaliatory conduct pursuant to the NYCHRL.

21.     Mr. Mazzullo, at all pertinent times, served as the President and Head of Global Sales for Jones and as a Director on the Jones Board, and had supervisory control over, and managed, Plaintiff.  Upon information and belief, Mr. Mazzullo, at all pertinent times, held the

7

authority to hire and fire Jones' employees, supervise and control employee work schedules and/or conditions of employment, provide bonuses, and maintain employment records.  Jones is strictly liable for his unlawful discriminatory and retaliatory conduct pursuant to the NYCHRL.

22.    Mr. Hill, at all pertinent times, served as the Chief Executive Officer for Jones and had supervisory control over, and managed, Plaintiff.  Upon information and belief, Mr. Hill, at all pertinent times, held the authority to hire and fire Jones' employees, supervise and control employee work schedules and/or conditions of employment, provide bonuses, and maintain employment records.  Mr. Hill signed Plaintiff's employment contract and the letter confirming her termination.  Jones is strictly liable for his unlawful discriminatory and retaliatory conduct pursuant to the NYCHRL.

23.    Mr. Chmielewski, at all pertinent times, was employed by Jones and had supervisory control over, and managed, Plaintiff.  Mr. Chmielewski currently serves as a Jones Director and, at all pertinent times, served as either Jones' General Counsel or as its Chief Operating Officer.  Mr. Chmielewski also held the authority to hire and fire Jones' employees at all pertinent times, including Plaintiff.  Upon information and belief, Mr. Chmielewski, at all pertinent times, held the authority to hire and fire Jones' employees, supervise and control employee work schedules and/or conditions of employment, provide bonuses, and maintain employment records.  Upon information and belief, Mr. Chmielewski has served on the Boards of JA, JTIS, and JTIL.  Jones is strictly liable for his unlawful discriminatory and retaliatory conduct pursuant to the NYCHRL.

24.    Each of the individually-named defendants exercised supervisory control over, and managed, JTIL and JTIS employees.

## JURISDICTION AND VENUE

25.     Plaintiff has complied fully with all administrative prerequisites applicable to her claims.

26.     On May 8, 2018, Plaintiff timely filed a Charge of Discrimination ("Charge of Discrimination") against Jones with the United States Equal Employment Opportunity Commission ("EEOC"), at its New York District Office, located in New York City, and with the New York State Division of Human Rights ("NYSDHR"), complaining of the acts of sexual discrimination and retaliation alleged herein.

27.     On February 15, 2019, the NYSDHR granted Plaintiff a Dismissal for Administrative Convenience.

28.     On February 28, 2019, the EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on March 4, 2019.

29.     This Court has jurisdiction over Plaintiff's claims under Title VII pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 1331, 1343(a)(4).

30.     This Court has jurisdiction over Plaintiff's pendent state and local law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to Plaintiff's Title VII claims as to form the same case or controversy under Article III of the United States Constitution.

31.     This Court has jurisdiction over Plaintiff's pendent state and local law claims pursuant to NYSHRL § 297(9) and NYCHRL § 8-107 *et seq.*

32.     Venue is proper within this District, pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391(b) and (c), in that Jones resides and can be found in this District, and because a

substantial part of the events or omissions giving rise to the claims alleged herein occurred within this District.

## STATEMENT OF FACTS

### A. *Plaintiff's Hiring and Accomplishments at Jones*

33.     Plaintiff joined Jones on or about June 15, 2016 as an Equity Institutional Sales Trader focused on merger arbitrage, advising clients about and executing equity trades.  She worked in that capacity until Jones unlawfully terminated her employment.

34.     At Jones, Plaintiff opened one of the firm's biggest accounts in Europe, D.E. Shaw and Co., which, upon information and belief, previously had black-listed Jones in Asia. She also built up the firm's risk arbitrage desk for "European Special Situations" (*i.e.*, risk arbitrage involving mergers in which one party to the merger is European), brought major new clients to the firm, supported U.S.-based accounts (including accounts based in New York City), improved the firm's trading with its U.S. clients, and was a major contributor to the firm's efforts to secure a new governmental fund account, the Abu Dhabi Investment Authority.  Plaintiff, at all pertinent times, was supervised at Jones by, *inter alia*, Jones employees based in New York City, including but not limited to, Mr. Cohen.

### B. *The U.S. Based Nature of Plaintiff's Job*

35.     At Jones, Plaintiff's accounts were almost entirely based in the U.S., and many of them were located in New York City, including her largest account, which she co-managed with Mr. Mazzullo.  Plaintiff supported her U.S.-based clients by working in tandem with Jones' employees in the U.S., who supervised and co-managed her accounts.  Accordingly, Plaintiff's job required her to interact daily with Jones traders and analysts across its offices, often using the

hoot-n-holler to discuss market conditions, broadcast accomplishments, and trade. Consequently, Plaintiff regularly travelled throughout Europe and the U.S., including to New York City.

36.     Upon information and belief, Plaintiff's New York City-based clients expected her to travel to New York City and meet with them.  Upon information and belief, Jones also expected Plaintiff to travel to New York City for work, and Jones' supervisors invited her to New York City to meet with clients and prospective clients.  When travelling to New York City for business, Plaintiff was expected to, and did, work out of Jones' New York City office.

### C. *Jones Subjected Plaintiff to Repeated Sexual Harassment and Exposed Plaintiff to an Unending Sexually Hostile Work Environment, Which Impacted Plaintiff Throughout Jones' Offices and in New York City*

37.     Upon starting at Jones, Plaintiff quickly learned that the firm, by its senior management, including Defendants Cohen, Cunningham, Mazzullo, Hill and Chmielewski, encouraged and maintained a culture pervaded by sexual harassment and intimidation across its offices.  Charlie McBride, Jones' Managing Director, emailed Plaintiff and told her not to "let our poor American manors [sic] bother you."  Plaintiff, in response, thanked him and wrote that it was "amazing" that she was the only woman the office.  In fact, the near total absence of female traders and analysts at the firm reflected the sexist and hyper-masculine culture Jones worked to cultivate.  Jones employed no more than five female traders and analysts at all pertinent times, while employing more than 90 male traders and analysts.

38.     Upon information and belief, Jones operated like a rowdy frat house, with employees using sex workers at work-related events and entertaining clients and potential clients with illicit drugs.  Locker room talk was the norm, and Jones' traders regularly made vile, sexist and misogynistic jokes and remarks – which were frequently directed and targeted at Plaintiff.

11

Much of that animus and discriminatory treatment derived from Jones' New York City-based

traders, occurred in New York City, and was condoned by Defendants Cohen, Cunningham,

Mazzullo, Hill and Chmielewski.

39.     Jones' degradation and mistreatment of Plaintiff began during her onboarding,

and constituted a pattern and practice of unlawful conduct throughout Plaintiff's employment.

While reviewing Plaintiff's candidacy, Mr. Cunningham referred to her as "the Lion King girl"

in emails with Mr. Hill.  Upon learning that Plaintiff was joining Jones, Nick Finegold, a friend

of Mr. Cunningham's who helped recruit Plaintiff to Jones, sent Mr. Cunningham a message

saying that Mr. Cunningham should "[t]ry not to sleep with [Plaintiff] please."

40.     Upon information and belief, on Plaintiff's first day at Jones, when her hiring was

announced over the hoot-n-holler, traders in the New York City office rushed to ogle Plaintiff's

social media accounts and comment on her appearance, saying things like "she's fucking hot."

Plaintiff, in turn, received numerous requests from Jones' New York City employees to connect

with her on various social-media sites, presumably so that they could gawk at her photographs.

41.     Upon information and belief, throughout the entirety of Plaintiff's employment at

the firm, Jones' traders and analysts across its offices, regularly commented on Plaintiff's

appearance when she spoke over the hoot-n-holler.  Upon information and belief, in New York

City, traders regularly questioned aloud, in words or effect, "who she was banging" and accused

her of using her sexuality to advance her career.

42.     As Plaintiff's direct supervisor and as the Chief Executive Officer of the London

Office, Mr. Cunningham regularly discriminated against, harmed, humiliated and demeaned

Plaintiff.  Mr. Cunningham regularly assigned U.S. accounts to Plaintiff's male peers – even

assigning one such account to a non-client-facing male employee – but never once gave Plaintiff

such an assignment, unless a client specifically requested her help.

43.     Mr. Cunningham, throughout Plaintiff's time at Jones, referred to her as

"Princess," and he often called her volatile and childlike.  On a near daily basis, Mr.

Cunningham made derogatory comments about Plaintiff to co-workers and clientele,

undermining her credibility and inhibiting her ability to secure new clients and service existing

clients.  Mr. Cunningham, however, refrained from similarly disrespecting his male supervisees.

Plaintiff, on a near daily basis, told Mr. Cunningham, in words or effect, that she disapproved of

his antics and treatment of her.

44.     For example, in or June 2016, at lunch with a client at Le Petite Maison, Mr.

Cunningham was consistently disrespectful to Plaintiff, stating in front of the client that she was

"only there to entertain."  Upon returning to the office, Plaintiff told Mr. Cunningham that he

needed to start "valuing her brain."  He responded by laughing, and telling Plaintiff that the

client had referred to her as "a great asset" and "a great hire."  Mr. Cunningham, in front of the

entire office, told Plaintiff that he responded to the client by stating, "Yes, until she's not."

45.     In or around May 2017, upon information and belief, Mr. Cunningham, speaking

to a client about Plaintiff, implied that Plaintiff was more flirtatious than professional.  Upon

information and belief, Mr. Cunningham told the client, in a seemingly sarcastic tone, in words

or effect, that Plaintiff had a "particular talent in the way that she deals with her clients," and that

he was surprised the client got along with Plaintiff because he did not "think she was [your] type

of person."  Upon information and belief, the client believed Mr. Cunningham to be insinuating

that Plaintiff used her sexuality to drive business.

46.     Plaintiff's colleagues at Jones freely discriminated against her in furtherance of the firm's sexually hostile culture.  For example, Plaintiff was invited to join a Jones WhatsApp group-chat with several of her office mates, including Mr. Cunningham and Darren Yarlett, Jones' Compliance Officer.  Although the group-chat ostensibly was used for work purposes, Ms. Kraiem was subjected on the group-chat to a barrage of bigoted, misogynistic and sexist messages from her coworkers.  Many of those messages were sent by Mr. Cunningham and Mr. Yarlett, who had Human Resources responsibilities at Jones and reported to Mr. Chmielewski.

47.     In that same group-chat, Jones' employees, including Mr. Cunningham, shared photographs and videos of, among other things, scantily clad women, sex shops, articles concerning a sex dungeon, bigoted and racist memes, and misogynistic memes commenting on the physical appearance of females.  Jones' employees regularly also sent sexist messages on the group-chat deriding wives and girlfriends, and shared entirely inappropriate barbs about their colleagues' sex lives.

48.     Plaintiff bore the brunt of many derogatory and sexist group-chat messages specifically directed at her.  Employees, including Mr. Yarlett and Mr. Cunningham, commented about, among other things, her appearance and weight, and referred to her as "princess." Plaintiff's coworkers shared photographs that they took of Plaintiff, unbeknownst to her. Plaintiff, in disgust, removed herself from the group-chat on or about August 30, 2017, after a colleague shared a video of the boxer, Floyd Mayweather, showering strippers with money.

49.     The harassment endured by Plaintiff went well beyond receiving inappropriate group-chat messages.  For example, in or around September 2016, at a work event in Rome, a fellow Jones trader drunkenly asked Plaintiff if he could go back to her hotel room.  Plaintiff

14

declined his advances, and informed Mr. Cunningham of the incident.  Rather than address it,

Mr. Cunningham, upon information and belief, gossiped to Plaintiff's colleagues about the

incident and made light of the situation.

50.     On or about April 27, 2017, while at a Jones event in Dallas, Texas lasting until

on or about April 30, 2017, Mr. Mazzullo, then President of Sales, unexpectedly hugged

Plaintiff, grabbed her waist, and said, in words or effect, to other male employees, "Look at her,

guys. Who would not trade with her?  She is such a beauty."  Mr. Mazzullo also said, in

reference to Plaintiff's looks, in words or effect, "I am sure it is not that hard for you to get

clients to trade."  Upon information and belief, Defendants Hill, Chmielewski and Cohen

observed Mr. Mazzullo's conduct, but did not take any action to rectify the situation or to

discipline or admonish Mr. Mazzullo.

51.     Later that day, after Plaintiff declined go with Jones employees to a strip club,

Mr. Mazzullo, at the hotel where the event was being held, followed Plaintiff, grabbed her, asked

where her room was, and implored her to go to the club, using his position of authority to try to

pressure her.  Mr. Mazzullo told Plaintiff, in words or effect, that he is the "President" and "the

biggest producer" and was going to be spending a lot of money at the club for Jones' employees.

52.     Plaintiff told Mr. Mazzullo that she was uncomfortable and proceeded to walk to

her room, but Mr. Mazzullo refused to stop.  He followed her to her door and asked if he could

return later to "say good-bye."  Although Plaintiff told him not to do so, Mr. Mazzullo persisted,

repeatedly saying, over her constant objections, that he would come to Plaintiff's room later that

night.  Mr. Mazzullo's actions left her shaken and intimidated.

53.     At that same Dallas event, male Jones employees repeatedly sexually humiliated Plaintiff, insinuating that Jones only employed her for "entertainment" purposes and/or for her looks.  One Jones trader messaged his colleagues on a group-chat that he was going to give Plaintiff's room number to "one of the 40 overweight guys" at the conference.  Later that day, the same trader sent a message to the group-chat saying that he "told all the guys last night that [Plaintiff was] coming off a bad break up and [is] single." Tim O'Neil, Jones' President of Trading, messaged Plaintiff that Jones employees were at a bar discussing how "hot" she was and how they wanted Plaintiff to "go out with them."  Other of Jones' employees sent messages to the group-chat discussing Plaintiff's "cowgirl" look, commenting on the attractiveness of the flight attendants on their flight to the Dallas event, and sharing a photograph of a woman in a bikini.

54.     In Dallas, the Jones management team, including, Mr. Hill, Mr. Chmielewski and Jeff LeVeen, Jr., Managing Director, Head of Outsourced Trading and Office Branch Manager, apparently learned that Plaintiff had had a romantic relationship with Mr. O'Neil, and took this information as a license to further sexually demean Plaintiff.  Upon information and belief, Mr. Chmielewski and Mr. Hill told Mr. O'Neil that he was no longer allowed to speak to Plaintiff, and Mr. O'Neil was subsequently asked to sign paperwork to that effect.  Upon information and belief, Plaintiff was referred to during the management team's conversation as a "bad woman with an agenda."

55.     On April 29, 2017, Mr. O'Neil messaged Plaintiff that he "might be getting fired" because of their relationship and that he had been told to "choose [Plaintiff] or Jones."  On or about May 6, 2017, Mr. O'Neil messaged Plaintiff, in words or effect, that Jones' management

16

made him worried that somebody would "come after" Plaintiff because of her relationship with

him.  Plaintiff and Mr. O'Neil, in turn, ended their relationship and stopped regularly messaging

one another.  However, Mr. O'Neil began incessantly messaging Ms. Kraiem in or around

September 2017, repeatedly inquiring into inappropriate subject areas, like her current

relationship status and reminiscing about the "fun" they had previously had together.

56.     Plaintiff reported Mr. Mazzullo's harassment to Mr. Cunningham in early May

2017.  Mr. Cunningham's response epitomized the firm's sexually hostile culture: he brushed

Plaintiff's complaint off as business as usual, telling Plaintiff that that was "Classic Dave" and,

in words or effect, that "of course" Mr. Mazzullo "was going to try" to come to her room.  Upon

information and belief, approximately two weeks thereafter, in Jones' Greenwich, Connecticut

office, a Jones employee referred to Plaintiff's looks, prompting Mr. Mazzullo to say, in words

or effect, that Plaintiff was "not his type."  In response, Mr. Cunningham chided Mr. Mazzullo,

saying in words or effect, that he had "heard otherwise" and that Mr. Mazzullo had followed

Plaintiff to her hotel room in Dallas.  Following Plaintiff's rejection of Mr. Mazzullo's unwanted

advances, her complaint to Mr. Cunningham about Mr. Mazzullo, and the revelation of her

relationship with Mr. O'Neil, Plaintiff became a pariah at Jones.

57.     In fact, during a business trip to San Francisco on or around the week of July 2,

2017, Plaintiff was told that Mr. Cunningham – while on a business trip to San Francisco several

weeks earlier – had told John Martinelli, the Managing Director and Branch Office Manager of

Jones' Mill Valley, California office, in words of effect, that Plaintiff was "trouble," and that Mr.

Martinelli should work with someone else from Jones' London office to co-cover a client for him

in Europe, even though Plaintiff had been the first Jones employee to help Mr. Martinelli trade in Europe.

i.      ***The Impact of Defendants' Unlawful, Discriminatory Conduct Was Felt by Plaintiff in New York City, Where She Endured Additional Discrimination and Was Further Exposed to Jones' Sexually Hostile Work Environment***

58.     Jones' pervasive sexually hostile environment, and the animosity engendered by Plaintiff's complaints about Mr. Mazzullo's conduct in Texas, reverberated throughout Jones and followed Plaintiff to, and impacted her in, New York City, which she visited for work from on or about July 10 through 16, 2017.

59.     Upon information and belief, Jones' employees in New York City ceased voluntarily working with her and/or otherwise tried to avoid interacting with her.

60.     For example, upon information and belief, senior managers and senior traders said, in words or effect, "nothing good comes from interacting with [Plaintiff]" and "what's the point of interacting with her, it can just cause trouble."  Upon information and belief, Jones employees in the New York City office also asked aloud, in words or effect, if Plaintiff was "banging Tim O'Neil."  Such statements and sentiments inhibited Plaintiff's ability to co-manage accounts with her New York City-based co-workers, leverage her co-workers' contacts and connections to develop new accounts and clients in New York City and elsewhere, and exchange information with her co-workers concerning global market conditions and developments.  The extent and effects of Defendants' animus and hostile actions directed towards Plaintiff further impacted her adversely during her business trip to New York City on or about July 10 through 16, 2017.

61.     On or about July 10, 2017, while in Jones' New York City office, Plaintiff overheard John D'Agostini, a Jones employee, say to other Jones employees, in words or effect,

about Plaintiff: "who's fucking her then?"  Plaintiff later confirmed in a Bloomberg chat with

former Jones employee Yousef Abbasi that Mr. D'Agostini had made that remark.  Upon

information and belief, Mr. Cohen witnessed Mr. D'Agostini conduct, but did not take any action

to rectify the situation or to discipline or admonish Mr. D'Agostini, who has since been

promoted by Jones.

62.     At or around the same time, at Jones' New York City offices, Plaintiff observed

male employees openly ogling her pictures on her social media accounts and commenting on her

breasts, saying, in words or effect, "look at her breasts" and "look at her boobs."

63.     On Friday, July 14, 2017, Mr. Cohen and Plaintiff agreed to have drinks with

New York City-based clients and potential clients, at a New York City bar called "The Jimmy,"

where she hoped to develop new business relationships and accounts.  At The Jimmy, a Jones

client instructed Plaintiff, in words or effect, to "come with me to the toilet and I'll go down on

you."  When Plaintiff reported this lewd proposition to Mr. Cohen, Mr. Cohen apologized but

made light of it, saying, in words or effect, "I'll request a big ticket from him [*i.e.*, the client] on

Monday" – essentially boasting that Plaintiff's sexual humiliation at work had commercial value

for Jones.  Plaintiff felt immediately and deeply hurt by these events.

64.     Upon information and belief, on the next workday, in Jones' New York City

office, Mr. Cohen laughed and joked about the incident referenced in paragraph 63 herein, telling

the firm's employees that a client had, in words or effect, asked Nefissa to "sit on his face."

Upon information and belief, Jones senior management, including Defendants Hill,

Chmielewski, Mazzullo and Cunningham, learned about the incident, but never took any action

to rectify the situation, admonish the client, or to admonish or discipline Mr. Cohen.

65.     During that same trip to New York City, Mr. Cunningham invited Plaintiff to have drinks with New York City-based clients at a bar on July 11, 2017, and she was led to believe by Mr. Cunningham that she might be placed on those clients' accounts.  Mr. Cunningham then messaged her that the dress code was "cool and sexy. So you better not come." When Plaintiff arrived at the bar, Mr. Cunningham introduced her to clients, in words or effect, as the head of "fashion" and "entertainment" and "occasionally [a] trader" – thereby humiliating and demeaning Plaintiff and her professional status and accomplishments.

66.     During the same client event, Mr. Cunningham asked Plaintiff, in the presence of clients, if her dress was lingerie or a real dress and said, in words or effect, "I don't even see how you can wear underwear under that."  Mr. Cunningham then insinuated in front of clients that Plaintiff seduced and entertained clients in order to get trading orders, further humiliating and demeaning her and essentially ensuring that she would not be taken seriously by those clients or given an opportunity to work with them.

67.     During the same client event, while at the bar, Mr. Cunningham insisted that Plaintiff let him take a photograph of her with a client, and then proceeded to message the photograph to their co-workers with an accompanying caption which read, in words or effect, "look who wants to change coverage now."  In so doing, Mr. Cunningham again insinuated that Plaintiff was using her sexuality to obtain new accounts and again severely undermined Plaintiff's reputation as a professional trader worthy of new business opportunities.

68.     After leaving the client event, Mr. Cunningham walked Plaintiff back to the W hotel, where she was staying.  They proceeded to the hotel's bar, where Plaintiff broke down crying.  Plaintiff confronted Mr. Cunningham, saying, in words or effect, that he could not "keep

treating [her] like this." Plaintiff told Mr. Cunningham that he habitually made her look bad in front of clients, picked on her, and used her as a punching bag. She further complained that she did not understand why he treated her so poorly, and that she was incredibly frustrated.

69.    In response, Mr. Cunningham apologized to Plaintiff, telling her, in words or effect, that he would cease treating her poorly. He then hugged her. The next day, July 12, 2017, Mr. Cunningham sent Plaintiff a message saying, "I listened to everything you said last night. You are truly amazing and I will tell you that every other day."

70.    Nonetheless, upon information and belief, Mr. Cunningham shared the photograph he took of Plaintiff with Jones employees in its Connecticut office, which Mr. Mazzullo supervised. Further, upon information and belief, Jones employees, including employees in Jones' New York City office, learned of and gossiped about the incident. Mr. Cohen, for instance, sarcastically commented to Plaintiff while she was in New York City, in words or effect, that he had heard that the client wanted to change coverage, that Plaintiff had done a good job at the client meeting, and that Plaintiff was going to steal all of Jones' big clients. Upon information and belief, Jones senior management, including Defendants Hill, Cohen, Chmielewski and Mazzullo, learned about the incident, but never took any action to rectify the situation or to admonish or discipline Mr. Cunningham.

ii.     ***The Pattern of Discrimination and the Sexually Hostile Workplace to Which Plaintiff Was Subjected in New York City Continued Unabated After She Left***

71.     Having been sexually humiliated, harassed and prostituted throughout her time in New York City, Plaintiff returned to London on or about July 16, 2017, hoping that the worst was behind her.  However, the discriminatory conduct and sexually hostile work environment to which she was subjected in New York City continued unabated.

72.     For example, within days of returning to London, Mr. Cunningham messaged Plaintiff and her colleagues, in a group-chat, that Plaintiff looked as if she was "homeless and coming straight in off the park bench."  Plaintiff told Mr. Cunningham, in the group-chat, to "watch his mouth."

73.     Mere days thereafter, Mr. Cunningham, while on a business trip to Abu Dhabi, made numerous derogatory comments about Plaintiff.  He claimed, in front of colleagues and clients, that she was only on the trip for entertainment purposes, prompting Plaintiff's colleagues to intervene and tell him he was behaving inappropriately.  During that trip, Mr. Cunningham, in a message sent to Plaintiff and her colleagues, told Plaintiff to wear a bikini.

74.     Thereafter, Mr. Cunningham became increasingly outwardly hostile towards Plaintiff.  On or about July 26, 2017, he wrote to Plaintiff that she had to stop "barking and sulking" when things did not go her way, and that he "cannot deal with [her] constant mood swings."  Mr. Cunningham even suggested that Plaintiff "mov[e] away from thinking of [herself] as risk arb and develop a different book.  Really work hard on say 5 and do more pairing up with US sales traders who would appreciate you getting out with their clients."  Plaintiff strenuously objected to his insinuation that she only added value to Jones by entertaining its clientele and,

shortly thereafter, informed Mr. Cunningham that she was being treated like a "witch who came to ruin everyone."

75.     The discrimination against and hostility toward Plaintiff escalated on August 8, 2017, after an argument ensued on the floor of Jones' London office because a trader did not know how to execute a particular trade, upsetting a client and costing Plaintiff (the sales trader on the transaction) a commission.  The trader called Plaintiff "dangerous" and "a stupid woman," prompting Plaintiff to complain to Mr. Cunningham about the manner in which she was being treated and to request that Mr. Cunningham apologize to the client on Jones' behalf.

76.     In response, Mr. Cunningham messaged Plaintiff that "in my 32 years in this business I have never seen someone with as little experience in our industry talk to people like you do. It is truly astounding ... WHO DO YOU THINK YOU ARE."  He further wrote to her that she has "no manners ... zero."  Plaintiff retorted that Mr. Cunningham was, once again, treating her disparately from the rest of her team, as Mr. Cunningham had previously apologized to a client after a similar incident occurred involving a male sales trader.  Mr. Cunningham ignored her sexual discrimination complaint, replying with "[m]y problem with you is you have no idea how to talk to people."

77.     Approximately two weeks thereafter, Plaintiff told Mr. Cunningham that she was interested in filing a Human Resources complaint regarding the August 8, 2017 argument.  On August 29, 2017, Mr. Cunningham forwarded to Plaintiff (apparently inadvertently) an email he had sent to Defendants Chmielewski and Hill, entitled "Draft email to Nefissa Kraiem" and stating, in part, "you clearly have a unique style with the accounts that you speak to and maybe there is a better firm out there that can harness your talents but if you decide to stay, please know

you will have our full support for as long as your behaviour warrants it."  That same day, Mr. Cunningham emailed Plaintiff that he wished to schedule a meeting with Mr. Yarlett, Mr. Chmielewski, and Mary Moser (Jones' human resources consultant) to "discuss the firm's anti-harassment policies and our expectations for your conduct going forward in light of some recent events."

78.     Mr. Cunningham's August 29, 2017 emails represented the culmination of more than a year's-worth of harassment that Plaintiff had endured.  That day, Plaintiff experienced the first of several work-induced panic attacks that she would suffer over the following months.  Plaintiff spent the night in the hospital, and began receiving medical attention for the trauma caused to her by Jones' unlawful discriminatory and retaliatory actions.

### iii.     *Defendants Failure to Address Plaintiff's Complaints about the Discrimination and Hostility She Endured in New York City and the End of Plaintiff's Employment at Jones*

79.     Beginning on August 31, 2017, the day after Plaintiff's discharge from the hospital, and continuing for approximately the next four months, Plaintiff spoke with Ms. Moser about the intentional disparate treatment and the sexually hostile work environment to which she was being subjected, including, in particular, the conduct she was subjected to in New York City.

80.     Plaintiff told Ms. Moser that she felt like a black sheep and told her about the emails referenced in paragraph 77.  Immediately following Plaintiff's conversation with Ms. Moser, Mr. Chmielewski, on September 1, 2017, referring to Plaintiff, directed Mr. Cunningham not to "send here [sic] any correspond without me seeing it first" and that "[w]e should not be having her write you and Darren separately as we do not want mixed messages."

81.     Upon information and belief, Messrs. Cunningham, Hill, and Chmielewski had, as of the middle of August 2017, begun planning to constructively discharge Plaintiff by relocating

Jones' London office to Gerrards Cross, a town approximately two hours away from the home in London that Plaintiff resided in, and was actively negotiating to purchase. Upon information and belief, Jones knew that Plaintiff could not undertake such a commute and arrive to work for a daily 8:00 a.m. market-open time, given the distance from her home to Gerrards Cross. Further, upon information and belief, Jones knew that its other seven employees in the London office would not leave the firm if were it to relocate to Gerrards Cross because: two of those employees lived in Gerrards Cross; four lived outside of London and would have a similar commute to Gerrards Cross as they had to London; and the remaining employee was required, for immigration reasons, to continue working for Jones or face deportation.

82.     Upon information and belief, Jones discussed, and solicited feedback about, its Gerrards Cross plans with some of Plaintiff's co-workers in or around the middle of August 2017, but Jones did tell Plaintiff that it might relocate its office until in or around early September.

83.     Shortly after Plaintiff learned about the potential move, Mr. Cunningham, on or about September 8, 2017, told Plaintiff, in words or effect, that the company was exploring its options because it was "sick of her drama."

84.     Upon information and belief, Jones had no intention of keeping its London office open. To that end, Mr. Cunningham, on October 4, 2017, sent an email to the London staff announcing that the London office would close unless they reached an entirely unrealistic six-month revenue goal. It was clear to Plaintiff at the time that the revenue goal was a mere pretext, and that the announcement was designed to end her employment at Jones.

85.     Plaintiff regularly complained about the move and, on or about October 17, 2017, specifically shared her concerns with Mr. Cunningham.

86.     The next day, a meeting was held between Mr. Cunningham, Mr. Chmielewski, Ms. Moser, Mr. Yarlett, and Plaintiff, ostensibly to discuss the firm's anti-harassment policies. During that meeting, Plaintiff expressly complained about the harassment and sexual hostility she had endured at the hands of Mr. Cunningham, and specifically recounted Mr. Cunningham's unlawful conduct in New York City.  Additionally, Plaintiff shared the message Mr. Cunningham had sent her on July 12, 2017, which stated that "I listened to everything you said last night. You are truly amazing and I will tell you that every other day."  In response, Mr. Chmielewski and Ms. Moser, in words or effect, changed the subject and said that the meeting was being held to discuss how the firm's anti-harassment policies applied to Plaintiff's conduct rather than to Mr. Cunningham's conduct, essentially ignoring Plaintiff's complaints.  Upon information and belief, Mr. Chmielewski and Ms. Moser did not thereafter investigate Mr. Cunningham's conduct or take any action to rectify the situation or to admonish or discipline him.

87.     Following that meeting, Ms. Moser wrote an email to Plaintiff and Mr. Chmielewski bearing the subject line "Recap of Today's Discussion," which stated that "[g]iven that both you and Gary have expressed frustration regarding the tension between the two of you, we agreed that Steve [Chmielewski] and I will sit in on meetings between you and Gary."

88.     On October 19, 2017, Plaintiff replied to Ms. Moser and Mr. Chmielewski by return email, stating that Mr. Cunningham had rolled his eyes at her throughout their October 18, 2017 meeting and that "a mediator between us during communication will be beneficial to

everyone and I hope will avoid this kind of humiliating behavior and mockeries that I am being

confronted [with]."  In another email dated October 19, 2017, Plaintiff told Ms. Moser and Mr.

Chmielewski, in words or effect, that she hoped to "reach the common goal of having a peaceful

and professional work environment," but that the October 18, 2017 discussion concerning Jones'

disciplinary procedures had not sufficiently addressed Mr. Cunningham's conduct.

89.     On or around October 19, 2017, Mr. Yarlett approached Plaintiff about again

meeting with Mr. Cunningham, telling Plaintiff, in words or effect, that Mr. Chmielewski and

Ms. Moser were concerned that Plaintiff would sue Jones and that she scared them.  In response,

Plaintiff agreed to meet with Mr. Cunningham and Mr. Yarlett, telling Mr. Yarlett, in words or

effect, that she did not want to lose her job.

90.     On or around October 20, 2017, Plaintiff met again with Mr. Cunningham and

Mr. Yarlett.  During that meeting, Plaintiff detailed for Mr. Cunningham and Mr. Yarlett the

ways in which Mr. Cunningham had discriminated against her in New York City.  In response,

Mr. Cunningham merely offered an apology, and no further action was undertaken to investigate

Mr. Cunningham's conduct, rectify the situation, or to admonish or discipline him.

91.     Later that day, Mr. Cunningham emailed Mr. Chmielewski, Mr. Hill, Mr. Yarlett,

and Ms. Moser, stating, in pertinent part, that Mr. Yarlett had  just "facilitated a meeting between

myself and Nefissa" and that "I have apologized in person for anything she feels I have said that

may have upset her over the last few months."  Mr. Cunningham further reported asking Plaintiff

to "focus on working toward making the number we set 4 weeks ago," and apologized to them

for "the time it has taken to get to this stage."  Upon information and belief, Mr. Chmielewski

and Mr. Hill did not investigate Mr. Cunningham's conduct or take any action to rectify the situation or to admonish or discipline him.

92.     Although Mr. Cunningham, offered an apology, things did not improve.  To the contrary, on November 14, 2017, Mr. Hill and Mr. Cunningham exchanged emails with the subject line "Evasive Action."  In one such email, Mr. Cunningham wrote that "Given the fuss [Plaintiff] has already made about leaving Mayfair I do not think she would work out of [the relocated office]," and suggested meting out her accounts to others.  The email further stated that "[w]e can always come back to Central London if we find the right team," implying that Plaintiff was part of the "wrong team," even though she was among Jones' top performers.

93.     Faced with Jones' continuing discrimination, her declining health and her precarious employment situation, Plaintiff canceled a previously planned trip to New York City in or around December 2017 to visit clients.

94.     The firm ultimately dropped its pretextual revenue goal, and Mr. Hill, on December 15, 2017, announced that effective January 1, 2018, Mr. Cunningham would assume the role of "Managing Director of Global Executive Services" for JTIS in the U.S. and no longer serve as JTIL's Chief Executive Officer, and that Jones would close the London office at the end of January 2018 – well before the end of the previously announced six-month timeframe.  That announcement effectively sealed Plaintiff's fate at Jones.

95.     On December 22, 2017, Jones sent Plaintiff a proposed revised contract, stating that the firm intended to move to Gerrards Cross by January 31, 2018, and conditioning her continued employment on her agreement to move to that location.   In sum and effect, that correspondence constructively discharged Plaintiff.

96.     Upon information and belief, Plaintiff's termination constituted an involuntary constructive discharge, precipitated by the intolerable, intentional unlawful discrimination and retaliatory conduct to which Plaintiff was subjected at Jones, and the pretextual change of work location designed to force Plaintiff's departure from the firm.  Subsequently, by letter dated January 15, 2018, signed by Mr. Hill, Plaintiff was informed that her employment had indeed been terminated.

97.     The events set forth in paragraphs 1 through 96 herein, including Defendants failure to ailed to investigate or take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct which occurred in New York City, devastatingly impacted Plaintiff's emotional well-being and her immediate and prospective business prospects throughout the U.S., and particularly in New York City, where she felt the immediate and long-term adverse effects of Jones' vile, gendered and discriminatory conduct.  With respect to her business prospects, Jones' actions significantly inhibited Plaintiff's ability to support and develop U.S. clients and accounts, particularly in New York City.

**D.     *Defendants Retaliated Against Plaintiff***

**i.     *Defendants Retaliated Against Plaintiff for Initiating Legal Proceedings Which Indicated that she was Subjected to Discriminatory Conduct in New York City***

98.     Following Plaintiff's discharge, Jones, through its management, took steps to undermine Plaintiff's ability to seek recourse by retaliating against her.

99.     On January 12, 2018, Plaintiff, through counsel, sent a correspondence to Ms. Moser which stated, in pertinent part, that the discrimination Plaintiff had faced left her with no option but to accept the termination of her contract of employment on closure of Jones' London office and that Plaintiff intended to pursue legal action.  Correspondingly, Plaintiff's counsel

provided Jones with a Discrimination Questionnaire which, among other thigs, requested

information concerning certain of the discriminatory acts to which Plaintiff had been subjected,

including the following incidents that occurred in the United States:

    a.  On 29 April 2017, whilst at a management conference in Dallas, NK
[Plaintiff] was followed back to her room by David Mazzullo (President of
Sales) after NK decided not to go out with colleagues to a strip club. David
Mazzullo then asked NK if he could come into her room. When she declined,
he said *'OK, let* me *come and say good night later* then;

    b.  In or around April 2017, after discovering that NK had. been in a relationship
with Tim O'Neil (President of Trading), the rest of the management team told
Tim O'Neil that he was no longer allowed to speak to NK (and asked him to
sign paperwork to that effect) because she was *'a bad woman with an agenda':*

    c.  In or around July 2017, when NK attended the New York office, John
D'Agostino from the New York office asked his colleagues *'who's fucking her
then?'* (referring to NK).

    100.    In an accompanying Data Subject Access Request, Plaintiff, through counsel,

requested that Jones provided her with information concerning, *inter alia*: her relationship with

Tim O'Neil; Mr. Cunningham's attitude towards her; Mr. Cunningham's Bloomberg chats from

July 15, 2015 through January 12, 2018; conversations between Mr. Cunningham and the

management team; Mr. Mazzullo's attitude towards her; and HR's involvement in any

discussions concerning her employment.  In the Data Subject Access Request, Plaintiff identified

the following individuals, among others, who may have processed personal data and sensitive

information about her claims: Mr. Cunningham; Mr. Mazzullo; and the HR department,

including Ms. Moser.

    101.    Shortly thereafter, by letter dated January 15, 2018, Plaintiff was informed that

her employment had been terminated.

102.   On January 25, 2018, Plaintiff, through counsel, sent a correspondence to Jones, providing it with an updated Discrimination Questionnaire and an updated Data Subject Access Request which, in addition to the information set forth in Paragraphs 99 and 100, sought, among other things, information concerning certain of the other discriminatory acts to which Plaintiff had been subjected, including the following incidents:

a.   In July 2017, whilst on a business trip to New York, Gary Cunningham invited NK to attend drinks with a client – [DWS]. When NK arrived, Gary Cunningham commented, in front of the client and referring to NK's outfit, I "don't even see how you can wear underwear under that."; and

b.   In or around July 20 17, whilst on a work trip to New York, NK was sexually assaulted by a US client at Jimmy's bar. The client said to her 'come with me to the toilet and I'll go down on you.' Moe Cohen (Managing Director of Investment Banking/Capital Markets) was also present and NK reported the incident to him. Moe Cohen apologised and said 'I'll request a big ticket (referring to the client) from him on Monday.'

103.   Thereafter, between January 25 and March 7, 2018, counsel for Plaintiff and JTIL engaged in settlement discussions, which ultimately proved unfruitful. At or around that same time, Defendants began retaliating against Plaintiff.

104.   For instance, upon information and belief, beginning in or around February 2018, Mr. Cunningham, operating through Mr. Finegold, repeatedly contacted Plaintiff's uncle, Guillaume Rambourg, a retired fund manager who is supportive of Plaintiff's career, in an attempt to get him to persuade Plaintiff to cease seeking recourse against Jones and its employees.  During those conversations, Mr. Finegold told Mr. Rambourg, in words or effect, that Jones had "dirt" and a "file" on Plaintiff, and that Jones would "destroy her" if she did not capitulate.  Upon information and belief, Mr. Finegold further indicated that Jones would negatively impact Mr. Rambourg's reputation.

105.     Additionally, in or around late February 2018 or early March 2018, upon information and belief, Jeffrey Sloves, Managing Director and head of Jones' New York City office, called Mr. Abbasi and said, in words or effect, that: there would be a telephone call the next day; Mr. Abbasi better "shut up and listen"; and Mr. Abbasi would likely get fired if he failed to heed that directive.

106.     The next day, Mr. Sloves brought Mr. Abbasi into a conference room in Jones' New York City office for a telephone call with Mr. Hill about Plaintiff.  Upon information and belief, during that telephone call, Mr. Hill told Mr. Abbasi, in words or effect, that Jones knew he was close with Plaintiff because Jones had been reviewing documents related to the termination of Plaintiff's employment, including Plaintiff's Bloomberg Messenger chats with him, presumably in response to the aforementioned correspondences sent by Plaintiff's counsel concerning the discriminatory treatment to which Plaintiff was subjected.

107.     Upon information and belief, during that conversation, Mr. Hill specifically referenced a Bloomberg Messenger chat that Mr. Abbasi had had with Plaintiff, in which he confirmed to Plaintiff that Mr. D'Agostini was the employee who, on or about July 10, 2017, had asked aloud "who's fucking her then."  Upon information and belief, Mr. Hill told Mr. Abbasi to "shut the fuck up," threatened to discharge him, and stated, in words or effect, that Mr. Abbasi's "year end bonus was entirely tied to his ability to shut the fuck up."  The statement made by Mr. D'Agostini, on or around July 10, 2017, in New York City, was among those set forth in the Discrimination Questionnaires submitted to Jones by Plaintiff's counsel mere weeks earlier.

32

ii.     ***Defendants Retaliated Against Plaintiff for Initiating Proceedings Before the EEOC and NYSDHR in New York City***

108.     Despite Defendants' efforts to silence Plaintiff, on May 8, 2018, Plaintiff filed the Charge of Discrimination against Jones with the EEOC, at its New York District Office, located in New York City, and with the NYSDHR.  The Charge of Discrimination stated, among other things, that Plaintiff was subjected to discrimination and a hostile work environment in Dallas, Texas and in New York City.  The Charge of Discrimination included the statement that Plaintiff "overheard John D' Agostino, a Jones employee, say to other Jones employees on the trading floor, about me, in words or effect, 'who's fucking her then?'"

109.     On May 30, 2018, counsel for Plaintiff sent a letter enclosing the Charge of Discrimination to Jones, which was addressed to the following individuals: William (Packy) Jones, Jones's Executive Chairman; Jason Lavender, Esq., General Counsel for JTIS; Erica Benton, a Solicitor representing JTIL; and Mr. Hill.  Upon information and belief, Mr. Chmielewski would have been made aware of that letter in the normal course of business.

110.     Upon information and belief, mere weeks after Jones received Plaintiff's Charge of Discrimination, on or about June 26, 2018, Mr. Abbasi was summoned to a conference room in Jones' New York City office for a telephone call with Mr. Hill, who told him that he was being placed on administrative leave for alleged expense account improprieties.  Upon information and belief, three days later, the firm told Mr. Abbasi that he had 24 hours to justify 30 months' worth of expenditures relating to, among other things, client travel, media appearances, and charity events.  Upon information and belief, the allegations of expense account improprieties were wholly unwarranted, and the threats made against Mr. Abbasi were designed to discourage him from serving as a witness for Plaintiff in proceedings against Jones,

as the very incident Mr. Hill had told Mr. Abbasi to "shut the fuck up" about had expressly

appeared in the Charge of Discrimination.

111.    Plaintiff and Mr. Abbasi had historically covered many of the same clients,

provided one another with market information, and served as references for one another – in

particular, Mr. Abbasi often introduced Plaintiff to prospective clients in New York City.

112.    Additionally, in or around late 2018, upon information and belief, Mr.

Cunningham told Macrina Otieno – a former client of Plaintiff who served as Director and

Trader at UBS Asset Management, which maintains offices in London and New York City – in

sum and effect, that Plaintiff was a liar, that doing busines with Plaintiff would be "bad for her

reputation," and that Plaintiff was a "bad woman."  Upon information and belief, Mr.

Cunningham also baselessly, unfoundedly, and incorrectly insinuated that Plaintiff might be

involved in insider trading, suggesting that such purported conduct could negatively impact Ms.

Otieno's reputation.

113.    Additionally, in or around late 2018 or early 2019, Mr. Cunningham contacted

Toby Bourke – a former client of Plaintiff who was then serving as a trader for a hedge fund with

a strong U.S. presence – about the lawsuit and told Mr. Burke, in words or effect, that Plaintiff

was a liar and that she was "trouble."

114.    Accordingly, the conduct set forth in paragraphs 98 through 113 adversely

affected Plaintiff's job prospect, as Defendants effectively blacklisted her, restricted her access to

her former co-worker and to former clients in such a way as to hamstring her future job

prospects, and damaged her reputation.  Moreover, because Defendants threatened Mr. Abbasi's

employment and made threatening comments to Mr. Rambourg, Plaintiff became concerned that

the continued prosecution of her claims could result in Defendants similarly threatening other of her family members and former colleagues.

    *iii.*    ***Defendants Retaliated Against Plaintiff for Filing the Instant Lawsuit in New York City***

    115.    After Plaintiff filed her initial complaint in the instant proceeding Jones, through its management, took further steps to retaliate against her by blacklisting her and by speaking ill of her to a potential client.

    116.    Upon information and belief, in May 2020, Mr. Cunningham, while having dinner with James Saltissi in New York City – a portfolio manager and the Chief Investment Officer at Kirkoswald Asset Management LLC, based in New York City – besmirched Plaintiff because she brought the instant action, prompting Mr. Saltissi to send a message to Mr. Rambourg, stating: "Having dinner with Gary Cunningham, tell ya niece to go home and stop lying.  Anyone that ever met her would know its fkn nonsense!"

    117.    Sometime thereafter, Mr. Saltissi sent Mr. Rambourg a subsequent text message, stating "Sorry for before, I was in a bad place (and drunk listening to 'poor Gary'). Anyway, apologies. So fkn embarrassing."  While employed at Jones, Plaintiff had spoken to Mr. Cunningham about her desire to solicit business from Mr. Saltissi, and Mr. Cunningham knew that Mr. Rambourg had introduced Plaintiff to Mr. Saltissi several years prior.

    118.    Upon information and belief, the retaliatory conduct set forth in paragraphs 115 through 117 herein was undertaken because Plaintiff opposed the unlawful, discriminatory conduct to which Plaintiff was subjected in New York City and elsewhere.

    119.    In sum, Jones unlawfully discriminated against Plaintiff because of her sex and gender, and unlawfully retaliated against her for making complaints about that discrimination, all

in violation of Title VII, the NYSHRL and the NYCHRL.  That unlawful sexual harassment, hostile work environment, and retaliation to which Plaintiff was subjected caused her to suffer severe emotional damage, which has adversely affected her health and well-being, manifested in physical symptoms, lead to suicidal thoughts, and caused irreparable reputational damage and humiliation.

### AS AND FOR A FIRST CAUSE OF ACTION (As Against Jones)

### Discrimination Based on Sex in Violation of Title VII

120.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 119 as though recited at length herein.

121.    Jones is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

122.    At all times pertinent herein, Plaintiff was an "employee" of Jones within the meaning of 42 U.S.C. § 2000e(f).

123.    Plaintiff, a female, is a member of a class protected by Title VII.

124.    Jones intentionally discriminated against Plaintiff by taking the adverse actions referenced in paragraphs 1 through 119 herein, solely on the basis of Plaintiff's sex.

125.    Jones has discharged Plaintiff and has discriminated against Plaintiff with respect to terms, conditions and privileges of employment, as referenced in paragraphs 1 through 119, on the basis of Plaintiff's sex, in violation of 42 U.S.C. § 2000e-2.

126.    Upon information and belief, Jones' discriminatory treatment of Plaintiff was part of a pattern and practice of intentional sex discrimination at Jones.

127.    The intentional discrimination against Plaintiff referenced in paragraphs 1 through 119 detrimentally affected Plaintiff.

128.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 119 would detrimentally affect a reasonable female in the same position as Plaintiff.

129.     The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 119 occurred in, and/or had an impact felt in, the City and State of New York.

130.     Jones committed the unlawful acts referenced in this First Cause of Action with malice and/or with reckless indifference to the federally protected rights of Plaintiff.

131.     Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and other damages, including, but not limited to, pain and suffering, humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and damage to reputation, as a result of Jones' discriminatory acts unless and until this Court grants the relief requested herein.

132.     Jones failed to exercise reasonable care to prevent and correct promptly the unlawful discrimination referenced in paragraphs 1 through 119.  Jones did not offer, and Plaintiff did not fail to take advantage of, any legitimate opportunities to prevent or correct the unlawful discrimination referenced in paragraphs 1 through 119 herein.  Jones is therefore strictly liable for the unlawful discrimination complained of herein.

133.     No previous application has been made for the relief requested herein.

**AS AND FOR A SECOND CAUSE OF ACTION (As Against All Defendants)**

**Discrimination Based on Sex in Violation of NYSHRL**

134.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 119 as though recited at length herein.

135.     Jones is an "employer" within the meaning of New York Executive Law § 296 et seq.

136.     At all times pertinent herein, Plaintiff was an "employee" of Jones within the meaning of New York Executive Law § 296 et seq.

137.     Plaintiff, a female, is a member of a class protected by NYSHRL.

138.     Defendants intentionally discriminated against Plaintiff by taking the adverse actions referenced in paragraphs 1 through 119, solely on the basis of Plaintiff's sex.

139.     Defendants have discharged Plaintiff and have discriminated against Plaintiff with respect to terms, conditions and privileges of employment, as referenced in paragraphs 1 through 119 on the basis of Plaintiff's sex, in violation of New York Executive Law § 296 et seq.

140.     Upon information and belief, Defendants' discriminatory treatment of Plaintiff was part of a pattern and practice of intentional sex discrimination at Jones.

141.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 119 detrimentally affected Plaintiff.

142.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 119 would detrimentally affect a reasonable female in the same position as Plaintiff.

143.     The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 119 occurred in, and/or had an impact felt in, the City and State of New York.

144.     Defendants Messrs. Cohen, Cunningham, Mazzullo, Hill, and Chmielewski were each supervisory employees of Jones and aided and abetted the discriminatory actions referenced

in paragraphs 1 through 119 and, therefore, are individually liable for the unlawful discrimination complained of herein.

145.    Defendants committed the unlawful acts referenced in this Second Cause of Action with malice and/or with reckless indifference to the protected rights of Plaintiff.

146.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and other damages, including, but not limited to, pain and suffering, humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and damage to reputation, as a result of Jones' discriminatory acts unless and until this Court grants the relief requested herein.

147.    Defendants failed to exercise reasonable care to prevent and correct promptly the unlawful discrimination referenced in paragraphs 1 through 119.  Defendants did not offer, and Plaintiff did not fail to take advantage of, any legitimate opportunities to prevent or correct the unlawful discrimination referenced in paragraphs 1 through 119 herein.  Defendants are therefore liable for the unlawful discrimination complained of herein.

148.    No previous application has been made for the relief requested herein.

**AS AND FOR A THIRD CAUSE OF ACTION (As Against All Defendants)**

**Discrimination Based on Gender in Violation of NYCHRL**

149.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 119 as though recited at length herein.

150.    Jones is an "employer" within the meaning of the NYCHRL.

151.    At all times pertinent herein, Plaintiff was an "employee" of Jones within the meaning of the NYCHRL.

152.     Plaintiff, a female, is a member of a class protected by NYCHRL.

153.     Defendants intentionally discriminated against Plaintiff by taking the adverse actions referenced in paragraphs 1 through 119 solely on the basis of Plaintiff's gender.

154.     Defendants have discharged Plaintiff and have discriminated against Plaintiff with respect to terms, conditions and privileges of employment, as referenced in paragraphs 1 through 119, on the basis of Plaintiff's gender, in violation of the NYCHRL.

155.     Upon information and belief, Defendants' discriminatory treatment of Plaintiff was part of a pattern and practice of intentional gender discrimination at Jones.

156.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 119 detrimentally affected Plaintiff.

157.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 119 would detrimentally affect a reasonable female in the same position as Plaintiff.

158.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 119 would detrimentally affect a reasonable female in the same position as Plaintiff.

159.     The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 119 occurred in, and/or had an impact felt in, the City and State of New York.

160.     Defendants Messrs. Cohen, Cunningham, Mazzullo, Hill, and Chmielewski were supervisory employees of Jones and engaged in, aided and abetted, and exercised managerial and/or supervisory control over, the discriminatory actions referenced in paragraphs 1 through 119 and, therefore, are individually liable for the unlawful discrimination complained of herein.

161.    Defendants have committed the unlawful acts referenced in this Third Cause of Action with malice and/or with reckless indifference to the protected rights of Plaintiff.

162.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and other damages, including, but not limited to, pain and suffering, humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and damage to reputation, as a result of Jones' discriminatory acts unless and until this Court grants the relief requested herein.

163.    Defendants failed to exercise reasonable care to prevent and correct promptly the unlawful discrimination referenced in paragraphs 1 through 119.  Defendants did not offer, and Plaintiff did not fail to take advantage of, any legitimate opportunities to prevent or correct the unlawful discrimination referenced in paragraphs 1 through 119 herein.  Defendants therefore are liable for the unlawful discrimination complained of herein.

164.    No previous application has been made for the relief requested herein.

## AS AND FOR A FOURTH CAUSE OF ACTION (As Against Jones)

### Unlawful Retaliation in Violation of Title VII

165.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 119 as if recited at length herein.

166.    Plaintiff engaged in protected activity by complaining to Jones, as referenced in paragraphs 1 through 119, about the sexual harassment and sexually hostile work environment to which she was subjected.

167.    In response to Plaintiff's complaints referenced in paragraphs 1 through 119 herein, Jones harassed Plaintiff and subjected her to adverse employment actions, including, but

not limited to, terminating her employment, as referenced in paragraphs 1 through 119 herein. The harassment and adverse actions referenced in paragraphs 1 through 119 herein materially altered the terms and conditions of Plaintiff's employment at Jones.

168.    Upon information and belief, Jones harassed Plaintiff and subjected her to adverse employment actions, as referenced in paragraphs 1 through 119 herein, in retaliation for Plaintiff's opposition to the sexual harassment and sexually hostile work environment at Jones and in order to discourage Plaintiff and other female employees from opposing Jones' sexually hostile work environment and unlawful discriminatory employment practices.

169.    The intentional discrimination against Plaintiff referenced in paragraphs 1 through 119 would detrimentally affect a reasonable female in the same position as Plaintiff.

170.    The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 119 occurred in, and/or had an impact felt in, the City and State of New York.

171.    In violation of 42 U.S.C. § 2000e-3, Jones has terminated Plaintiff and has discriminated against Plaintiff with respect to terms, conditions and privileges of her employment, on the basis of her opposition to discriminatory practices prohibited by 42 U.S.C. § 2000e-2.

172.    Jones committed the unlawful acts referenced in this Fourth Cause of Action with malice and/or with reckless indifference to the federally protected rights of Plaintiff.

173.    Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and other damages, including, but not limited to, pain and suffering, humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and

42

damage to reputation, as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

174.    No previous application has been made for the relief requested herein.

### **AS AND FOR A FIFTH CAUSE OF ACTION (As Against All Defendants)**

### **Unlawful Retaliation in Violation of the NYSHRL**

175.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 119 as if recited at length herein.

176.    Plaintiff engaged in protected activity by complaining to Defendants, as referenced in paragraphs 1 through 119, about the sexual harassment and sexually hostile work environment to which she was subjected.

177.    In response to Plaintiff's complaints referenced in paragraphs 1 through 119 herein, Defendants harassed Plaintiff and subjected her to adverse employment actions, including, but not limited to, terminating her employment, as referenced in paragraphs 1 through 119 herein.  The harassment and adverse actions referenced in paragraphs 1 through 119 herein materially altered the terms and conditions of Plaintiff's employment at Jones.

178.    Upon information and belief, Defendants harassed Plaintiff and subjected her to adverse employment actions, as referenced in paragraphs 1 through 119 herein, in retaliation for Plaintiff's opposition to the sexual harassment and sexually hostile work environment at Jones and in order to discourage Plaintiff and other female employees from opposing Jones' sexually hostile work environment and unlawful discriminatory employment practices.

179.    The intentional discrimination against Plaintiff referenced in paragraphs 1 through 119 would detrimentally affect a reasonable female in the same position as Plaintiff.

180.     The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 119 occurred in, and/or had an impact felt in, the City and State of New York.

181.     In violation of NYSHRL § 296 (7) Jones has terminated Plaintiff and has discriminated against Plaintiff with respect to terms, conditions and privileges of her employment, on the basis of her opposition to discriminatory practices prohibited by the NYSHRL § 296 et seq.

182.     Defendants committed the unlawful acts referenced in this Fifth Cause of Action with malice and/or with reckless indifference to the protected rights of Plaintiff.

183.     Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and other damages, including, but not limited to, pain and suffering, humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and damage to reputation, as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

184.     No previous application has been made for the relief requested herein.

**AS AND FOR A SIXTH CAUSE OF ACTION (As Against All Defendants)**

**Unlawful Retaliation in Violation of the NYCHRL**

185.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 119 as if recited at length herein.

186.     Plaintiff engaged in protected activity by complaining to Defendants, as referenced in paragraphs 1 through 119, about the sexual harassment and sexually hostile work environment to which she was subjected.

187.     In response to Plaintiff's complaints referenced in paragraphs 1 through 119, Defendants harassed Plaintiff and subjected her to adverse employment actions, including, but not limited to, terminating her employment, as referenced in paragraphs 1 through 119 herein. The harassment and adverse actions referenced in paragraphs 1 through 119 herein materially altered the terms and conditions of Plaintiff's employment at Jones.

188.     Upon information and belief, Defendants harassed Plaintiff and subjected her to adverse employment actions, as referenced in paragraphs 1 through 119 herein, in retaliation for Plaintiff's opposition to the sexual harassment and sexually hostile work environment at Jones and in order to discourage Plaintiff and other female employees from opposing Jones' sexually hostile work environment and unlawful discriminatory employment practices.

189.     The intentional discrimination against Plaintiff referenced in paragraphs 1 through 119 would detrimentally affect a reasonable female in the same position as Plaintiff.

190.     The intentional discrimination, hostile work environment and retaliation referenced in paragraphs 1 through 119 occurred in, and/or had an impact felt in, the City and State of New York.

191.     In violation of NYCHRL Jones has terminated Plaintiff and has discriminated against Plaintiff with respect to terms, conditions and privileges of her employment, on the basis of her opposition to discriminatory practices prohibited by the NYCHRL § 8-107(7).

192.     Defendants committed the unlawful acts referenced in this Sixth Cause of Action with malice and/or with reckless indifference to the protected rights of Plaintiff.

193.     Plaintiff has suffered, is now suffering and will continue to suffer irreparable injury, monetary damages and other damages, including, but not limited to, pain and suffering,

humiliation, mental anguish, loss of life's pleasures, depression, anxiety, stress, panic and damage to reputation, as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

194.    No previous application has been made for the relief requested herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully respects that this Court enter a Judgment:

(a) declaring that the acts and practices complained of herein are in violation of Title VII, the NYSHRL and the NYCHRL;

(b) enjoining and restraining permanently the violations complained of herein;

(c) directing Defendants to provide Plaintiff with back pay, front pay and benefits that will place her in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment, and that will make her whole for all earnings and benefits she would have received but for Defendants' discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, commissions, pension benefits, life and accident insurance benefits, profit sharing benefits, and all other lost compensation and benefits;

(d) enjoining Defendants from harassing or engaging in any acts of reprisal or retaliation against Plaintiff for seeking to obtain her statutory rights to not be discriminated against on the basis of sex and to not be retaliated against for her protected complaints and objections, and from otherwise interfering with the rights of Plaintiff;

(e) directing Defendants to take such affirmative action as is necessary to assure that the effects of the unlawful employment practices complained of herein are eliminated and do not continue to affect Plaintiff's employment opportunities;

(f) directing Defendants to pay Plaintiff additional amounts of compensatory and punitive damages for, among other things, pain and suffering, humiliation, mental anguish and damage to reputation, as provided for in 42 U.S.C. § 1981a(a)(1), 42 U.S.C. § 2000e-5(g), N.Y. Exec. Law §§ 297(4), (9) and (10), and N.Y.C. Admin. Code § 8-502;

(g) awarding Plaintiff the costs of this action together with reasonable attorneys' fees, as provided for in 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), N.Y. Exec. Law §§ 297(4), (9) and (10), and N.Y.C. Admin. Code § 8-502; and

(h) granting such other and further relief as this Court deems necessary and proper.

Dated: November 16, 2020
New York, New York

                        STULBERG & WALSH, LLP
                        Attorneys for Plaintiff


                        By: _____/s/_____
                        Robert B. Stulberg (RS2734)
                        Zachary R. Bergman (ZB2811)
                        One Penn Plaza, Suite 2601
                        New York, New York 10119
                        (212) 268-1000

## DEMAND FOR JURY TRIAL

Plaintiff, by and through his above-signed counsel, hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in the above-captioned action.